Strafford
No. 2004-555

HEIDI CARLISLE

v.

FRISBIE MEMORIAL HOSPITAL & a.

Argued: September 15, 2005
Opinion Issued: November 30, 2005

*Backus, Meyer, Solomon & Branch LLP*, of Manchester (*Jon Meyer* on the brief and orally), for the plaintiff.

*McDonough & O'Shaughnessy, P.A.*, of Manchester (*Michael B. O'Shaughnessy* and *Robert J. Meagher* on the brief, and *Mr. Meagher* orally), for the defendants.

GALWAY, J. This appeal follows a jury trial in Superior Court (*Mohl*, J.) awarding a verdict for the plaintiff, Heidi Carlisle, on her claims against the defendants, Frisbie Memorial Hospital (Frisbie) and John Jackson, M.D. We affirm.

On appeal, the defendants argue that the trial court erred by: (1) submitting to the jury the plaintiff's professional negligence claim, her claims under the federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2000), and her claims under the New Hampshire Patients' Bill of Rights Act (PBR), RSA 151:19-:31 (1996); (2) submitting erroneous jury instructions on EMTALA, professional negligence, and damages; (3) refusing to allow Dr. Jackson's discovery deposition to be read into evidence at trial; and (4) refusing to grant defendants' motion for remittitur.

The jury could have found the following facts. The plaintiff had a history of alcohol abuse and mental illness. When she drank alcohol, it often elicited feelings of depression and thoughts of a sexual assault that she experienced as a teenager.

During the day of May 6, 2000, the plaintiff consumed alcohol. That evening, she drank more alcohol and became increasingly depressed and suicidal. Desiring treatment for her condition, she drove to Frisbie's emergency room at approximately midnight. She chose Frisbie because it was nearby and because she knew that it advertised mental health services.

Upon arrival, a hospital employee led the plaintiff to an examining room. Dr. Jackson, the department physician on duty, saw her a few minutes later. She told him that she had been drinking and had suicidal thoughts involving hanging herself. He asked if she wanted to see a counselor from the Strafford Guidance Center, an organization that treats patients with mental illnesses in the hospital. She declined the offer, stating that she was involved with the Strafford Guidance Center through her work. She told him that she would see any other counselor or psychologist. He then left the room. He returned a few minutes later and asked, again, if she would see Strafford Guidance. She again declined. He told her that he was going to get her help and left the room. She testified that she assumed he meant

that he was going to find another counselor or psychologist; she had not acted in a disruptive or disorderly manner during her interactions with him. After he left, she was alone in the examining room and did not attempt to leave.

During one of the two intervals in which Dr. Jackson left the room, he called the police. He never told the plaintiff that he intended to do so. After he exited the room for the second time, the next person into the room was Officer Macaione of the Rochester Police Department. The plaintiff asked Officer Macaione what he was doing there, and he responded by asking her questions regarding her alcohol consumption, her suicidal thoughts, and whether she would take a blood-alcohol test. She answered that she was intoxicated, that she had suicidal thoughts, and that she thought a blood-alcohol test was a waste of time and money, since she admitted to being drunk. Officer Macaione then informed her that he was going to take her to jail, and handcuffed her.

Another officer arrived at the hospital to assist Officer Macaione. Outside of the plaintiff's presence, Dr. Jackson gave one of the officers a note, stating, "Heidi Carlisle is medically cleared to enter protective custody for suicidal intent and alcohol intake." Officer Macaione then led the plaintiff out of the hospital. On the way out, the plaintiff saw Dr. Jackson. She told him that she disliked him and that she hated him for calling the police and having her taken to jail. The plaintiff testified that, had Dr. Jackson informed her that jail was the alternative, she would have agreed to see a counselor from Strafford Guidance Center. Upon exiting the hospital, she felt depressed and betrayed because he never warned her of the possibility of going to jail. She also felt embarrassed as people watched Officer Macaione lead her out of the hospital.

Officer Macaione drove the plaintiff to the Strafford County Jail at approximately 1:00 a.m. A guard at the jail kicked her feet apart, frisked her, then searched her. She asked if she could make a phone call, and the guard said "no." The guard placed her in a cell with a concrete slab for a bed, a toilet, and a sink. There was another woman in the cell, who was asleep on the bed. When the plaintiff used the toilet, she was exposed to both the woman in the cell and anyone walking by in the hallway. She was in the jail cell for approximately fourteen hours without food, water, or medical treatment. During that time, she felt betrayed, depressed, and confused about why she was there. A counselor from Strafford Guidance Center met her at the jail on the afternoon of May 7. After their meeting, the police released her.

As a result of the events of May 6 and 7, the plaintiff's mental illness worsened. Her therapist testified that her experience at Frisbie made her reluctant to trust any medical professionals or see a therapist. The plaintiff

also testified that the betrayal that she felt after seeing Dr. Jackson made her postpone seeing a therapist for months. During that time, she drank more heavily, and her depression and thoughts of suicide intensified. Her mental state affected the quality of her work and caused her to miss work at the child care business that she ran. The plaintiff also resigned from her job at the local fire department because she anticipated being fired after showing up to work intoxicated. She experienced a loss of appetite and, on multiple occasions, called a friend late at night crying because of the betrayal that she felt at Frisbie.

The plaintiff brought three causes of action against the defendants: (1) violation of EMTALA against Frisbie; (2) professional negligence against Dr. Jackson; and (3) violation of the PBR against Frisbie. The jury found for the plaintiff on all three counts.

## I. EMTALA

An overview of the EMTALA statute gives context to our determinations below. Enacted in 1986, EMTALA requires that hospitals receiving the benefit of federal Medicare funding take certain steps to ensure appropriate care for emergency room patients. *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1189 (1st Cir. 1995); *see also* 42 U.S.C. § 1395dd; Furrow, *An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act*, 16 J. LEGAL MED. 325, 325-26 (Sept. 1995). The first step that EMTALA requires emergency rooms to take is to properly screen, or examine, all patients admitted to the emergency room seeking medical assistance. *Correa*, 69 F.3d at 1190; *see also* 42 U.S.C. § 1395dd(a). If the patient has an emergency medical condition, EMTALA requires that the hospital either examine and treat the patient as necessary to stabilize the patient's condition, or transfer the patient to another medical facility when such a transfer is relatively safe and medically advisable. *Correa*, 69 F.3d at 1190; *see also* 42 U.S.C. § 1395dd(b)(1)(B), (c)(1). To establish a violation of EMTALA, the plaintiff must prove:

> (1) that the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

*Correa*, 69 F.3d at 1190.

### A. Waived Objections

Frisbie asserts that the plaintiff did not present sufficient evidence from which a reasonable jury could find that she satisfied the following two elements of an EMTALA claim: first, that Frisbie was a "participating hospital" under EMTALA; and, second, that Frisbie improperly "transferred" the plaintiff. *Id.* The plaintiff argues that Frisbie waived these issues and is precluded from raising them on appeal. We agree.

> The well-established rule is that an objection to the sufficiency of evidence is waived unless taken at a time when there may still be an opportunity to supply the deficiency .... [T]he defendant could not lie by until after the evidence, arguments, and charge to the jury were closed, and then first avail himself of an objection that was open to him, and which in fairness he ought to have taken as soon as the evidence for the plaintiff was closed, or, at latest, when the evidence was closed on both sides.

*Derosier v. New England Telephone & Telegraph Co.*, 82 N.H. 405, 405-06 (1926) (citations and quotations omitted); 5 R. WIEBUSH, NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 48.12, at 331 (1984) (stating, "[a] Motion for Directed Verdict may be filed at any time after all the evidence for the moving party's opponent has been presented and before the case is taken under advisement or the jury is charged").

Frisbie failed to raise its sufficiency of the evidence objections regarding either "participation" or "transfer" until after the trial court gave the jury instructions. The record reveals ample opportunity for Frisbie to have raised objections regarding the plaintiff's proof of participation and improper transfer prior to that point. For instance, after the close of plaintiff's evidence, Frisbie moved for directed verdict, raising such issues as the PBR, damages, RSA 239:1, RSA 172-B:1, and deterioration of condition under EMTALA. Additionally, the trial court gave Frisbie the opportunity to renew its motion for directed verdict at the close of its case. Frisbie did so, but again failed to raise either "participation" or improper "transfer." By waiting to raise its sufficiency of the evidence objections until after the jury instruction, Frisbie deprived the trial court of opportunities to expediently correct the deficiency of evidence. Frisbie, "[lay] by until after the evidence, arguments, and charge to the jury were closed," and then raised its objections. *Derosier*, 82 N.H. at 406. We conclude, therefore, that Frisbie waived its objections

regarding the sufficiency of evidence presented to support the "participation" and improper "transfer" elements of EMTALA.

*B. Stabilization*

Frisbie appeals the trial court's denial of its motion for directed verdict, arguing that the plaintiff failed to present evidence from which a reasonable jury could find that Frisbie did not "stabilize" the plaintiff under EMTALA.

> Our review of a trial court's denial of a motion for a directed verdict is extremely narrow. We will uphold a denial of the motion where sufficient evidence in the record supports the ruling. A party is entitled to a directed verdict only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the nonmoving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand.

*Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 413-14 (2004) (quotations and citations omitted).

Frisbie disputes prong (3)(b) of the *Correa* test, which requires the plaintiff to prove that she arrived at the hospital with an "emergency medical condition" and that the defendants either turned her away, discharged her, or improperly transferred her without first "stabilizing" her "emergency medical condition." *Correa*, 69 F.3d at 1190.

We first consider whether the evidence supports a finding that the plaintiff had an "emergency medical condition" under EMTALA. EMTALA defines an "emergency medical condition" as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual ... in serious jeopardy, (ii) serious impairment of bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd (e)(1)(A). "Under this definition, a patient will suffer from an emergency medical condition if he is in imminent danger of death or serious disability." *Pagan-Pagan v. Hospital San Pablo, Inc.*, 97 F. Supp. 2d 199, 203 (D. P.R. 2000) (quotations omitted).

 Frisbie argues that the plaintiff's depression was not an "emergency medical condition," and that the plaintiff provided insufficient evidence to prove otherwise. The plaintiff's evidence of her emergency medical

condition includes her testimony that she arrived at Frisbie intoxicated and feeling suicidal with a plan to carry out her suicide. She presented expert testimony that intoxicated, suicidal patients are common in emergency rooms, that they pose a health risk to themselves, and that they require persistent monitoring in safe rooms. She also presented expert testimony that emergency room physicians monitor intoxicated patients' vital signs to check for seizure or other serious effects of alcohol withdrawal. Further, an expert witness of the defendants testified that there was an "overriding concern about the patient's safety." The trial court found the above evidence sufficient to support a finding that the plaintiff's health was in imminent danger. We agree.

We next consider the evidence regarding whether Frisbie properly "stabilized" the plaintiff before transferring her out of the hospital. EMTALA defines "stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . ." 42 U.S.C. § 1395dd(e)(3)(A). A psychiatric patient is considered stable for purposes of discharge under EMTALA "when he/she is no longer considered to be a threat to him/herself or others." *Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 893 (7th Cir. 2003) (applying the Health Care Financing Administration's definition of stability for psychiatric patients).

■ The evidence supporting the plaintiff's assertion that the hospital failed to stabilize her included expert testimony from a defense witness that "[t]his patient needed stabilizing of her suicidal ideation and plan, and she also needed stabilization of her intoxication with alcohol." When asked whether the plaintiff was psychiatrically unstable when she left the hospital for protective custody, defendants' expert witness testified, "Yes, and that is why she was placed in protective custody, because her psychiatric instability was a threat to her life." The medical records from Frisbie state that the plaintiff's disposition was "transferred to jail," that her condition was "unchanged," and a box entitled "stable" was unchecked. Additionally, the plaintiff testified that the only steps that Dr. Jackson took to treat her condition before calling the police were to perform a brief examination and offer for her to see Strafford Guidance.

Reviewed in the light most favorable to the plaintiff, the evidence is not so overwhelmingly in favor of Frisbie that no verdict contrary to Frisbie's could stand. We therefore agree with the trial court's decision to deny Frisbie's motion for directed verdict.

*C. Preemption—Justification*

Frisbie argues that, as a matter of law, EMTALA does not preempt state statutes; therefore, a state statute that justifies Frisbie's conduct should bar it from civil liability, even if the state statute conflicts with EMTALA. Frisbie argues that RSA 172-B:3 (1994) justifies Frisbie in contacting the police to take the plaintiff into protective custody.

The trial court's determination of preemption is a matter of law, which we review *de novo. Koor Communication v. City of Lebanon*, 148 N.H. 618, 620 (2002). "Under the Supremacy Clause of the Federal Constitution, state law is preempted where: (1) Congress expresses an intent to displace state law; (2) Congress implicitly supplants state law by granting exclusive regulatory power in a particular field to the federal government; or (3) state and federal law actually conflict." *Id.* (quotations omitted).

EMTALA's preemption provision provides, "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Frisbie's argument that EMTALA disclaims all preemption of state laws is incorrect. The provision explicitly states that when EMTALA and a state law conflict, EMTALA preempts the state law. "An actual conflict exists when it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishments and execution of the full purpose and objective of Congress." *Koor*, 148 N.H. at 621 (quotations omitted).

We now address Frisbie's claim that EMTALA does not preempt RSA 172-B:3. RSA 172-B:3 provides:

I. When a peace officer encounters a person who in the judgment of the officer is intoxicated . . . the officer may take such person into protective custody and shall take whichever of the following actions is, in the judgment of the officer, the most appropriate to ensure the safety and welfare of the public, the individual, or both:

 . . . .

c. Lodge the person in a local jail or county correctional facility for said person's protection, for up to 24 hours or until the keeper of said jail or facility judges the person to be no longer intoxicated.

Frisbie argues that, as a matter of law, RSA 172-B:3, I(c) justified its conduct in contacting the police. Frisbie contends that RSA 172-B:3, I(c)

permitted the defendants to call the police for the purpose of taking the plaintiff out of Frisbie and putting her in jail.

■ Applying the definition of "actual conflict," we determine that there was an actual conflict between EMTALA and the conduct that Frisbie argues RSA 172-B:3, I(c) permits. It is well established that one of Congress' purposes in enacting EMTALA was to prevent hospitals from transferring patients without first assessing or stabilizing the patients' emergency conditions. *E.g.*, *Rodriguez v. American Intern. Ins. Co. of Puerto Rico*, 402 F.3d 45, 47 (1st Cir. 2005). To accomplish this goal, EMTALA provides that a hospital must stabilize a patient before transferring that patient, except in limited circumstances, none of which Frisbie claims occurred. 42 U.S.C. § 1395dd(c)(1). For a hospital to summon a police officer for the purpose of removing an intoxicated, unstabilized person from the hospital and take that person to jail before that person is stabilized would stand as an obstacle to the execution of Congress' purpose in enacting EMTALA, because it would permit the hospital to ignore ETMALA's stabilization requirement. Under the circumstances of this case, we determine that RSA 172-B:3 conflicted with EMTALA, and that EMTALA preempted it.

*D. Preemption—Jury Instruction*

Frisbie argues that the following portion of the trial court's jury instruction on EMTALA misled the jury: "[Y]ou must find that the hospital failed to transfer the plaintiff to a medical facility for appropriate medical treatment." Frisbie argues that this instruction essentially directed a verdict for the plaintiff and ignored the other statutes that could have applied to transferring the plaintiff out of the hospital.

We review the adequacy of jury instructions as follows:

> The purpose of jury instructions is to identify issues of material fact, and to inform the jury of the appropriate legal standards by which it is to resolve them. A jury charge is sufficient as a matter of law if it fairly presents the case to the jury such that no injustice is done to the legal rights of the parties. In a civil case, we review jury instructions in context to determine if the charge, taken in its entirety, fails to explain adequately the law applicable to the case in such a way that the jury could have been misled.

*Broughton v. Proulx*, 152 N.H. 549, 556 (2005).

By isolating one sentence of the trial court's EMTALA instruction, Frisbie characterizes the instruction as a command from the court requiring the jury to find an inappropriate transfer. Examining the

disputed instruction in context, we conclude that the trial court stated it as one element required for proving an EMTALA violation. The trial court instructed the jury that there are three elements required for proving an EMTALA violation: (1) "you must first find that the plaintiff presented to the emergency room with an emergency medical condition"; (2) "next you must find that the plaintiff was transferred from an emergency room before her emergency condition stabilized"; and (3) the disputed instruction.

■ We disagree with Frisbie's argument that the disputed jury instruction is an incorrect statement of law. EMTALA requires that, "if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition ... unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety." *Rodriguez*, 402 F.3d at 47. The disputed instruction, and the two elements that the trial court stated before it, encompassed EMTALA's requirements. As for the disputed instruction, transfer from a hospital is an option under EMTALA, but it must be to another medical facility or the hospital has violated EMTALA. *See id.* The disputed jury instruction adequately stated this requirement. We therefore conclude that the trial court's instruction accurately explained the law of EMTALA in such a way that the jury could not have been misled.

## II. Professional Negligence

### A. RSA 329:31

Dr. Jackson first argues that the plaintiff's professional negligence claim should not have gone to the jury because, as a matter of law, RSA 329:31 (1995) provides a complete defense to civil liability. Entitled, "Civil Liability; Duty to Warn," RSA 329:31 provides:

I. A physician licensed under this chapter has a duty to warn of, or to take reasonable precautions to provide protection from, a client's violent behavior when the client has communicated to such physician a serious threat of physical violence against a clearly identified or reasonably identifiable victim or victims, or a serious threat of substantial damage to real property.

II. The duty may be discharged by, and no monetary liability or cause of action may arise against, a physician licensed under this chapter if the physician makes reasonable efforts to communicate the threat to the victim or victims, notifies the police department

closest to the client's or potential victim's residence, or obtains civil commitment of the client to the state mental health system.

Dr. Jackson argues that the plaintiff's statement that she had contemplated suicide was a "serious threat of physical violence" and made her a "clearly identified victim" under RSA 329:31, I. Therefore, Dr. Jackson concludes, he was not negligent in calling the police because RSA 329:31, II required him to do so to satisfy his statutorily created duty to warn.

We apply the following standard of review for statutory interpretation:

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include.

*Woodview Dev. Corp. v. Town of Pelham*, 152 N.H. 114, 116 (2005) (citations omitted). "If a statute is ambiguous, however, we consider legislative history to aid our analysis. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *Hughes v. N.H. Div. of Aeronautics*, 152 N.H. 30, 38-39 (2005).

■ A plain reading of RSA 329:31 reveals that the statute does not apply to threats of suicide. We have previously recognized that "[t]he subject matter embraced by RSA 329:31 is limited to a physician's duty to warn of a client's violent behavior when the client has communicated a serious threat of physical violence against a clearly identified or reasonably identifiable victim." *Powell v. Catholic Med. Ctr.*, 145 N.H. 7, 11 (2000). There is no warning necessary for a threat of suicide, because the potential attacker and potential victim are the same person. The victim already knows of the danger.

Further, one way in which RSA 329:31 allows a physician to satisfy the duty to warn is to "make[] reasonable efforts to communicate the threat to the victim." RSA 329:31, II. It would be illogical for the statute to allow doctors to discharge their duties of protecting the victim simply by informing potential suicide victims that they have threatened to kill themselves. We will not interpret the statutory scheme to yield this

seemingly illogical result. *Town of Lyndeborough v. Boisvert Properties*, 150 N.H. 814, 819 (2004).

Even if there is ambiguity in RSA 329:31, our interpretation comports with the legislative intent for the statute. The House and Senate enacted RSA 329:31 as part of a bill entitled "An Act Relative to a Duty to Protect Third Persons." Laws 1986, ch. 175. The context in which the legislature intended RSA 329:31's duty of care to arise was clearly when a patient threatened a third person. Additionally, we note that the House Judiciary Committee's report on the bill containing RSA 329:31 states, "This bill limits the civil liability of certain medical and mental health providers ... so long as the providers contact the threatened victim, or the police, or seek civil commitment." N.H.H.R. JOUR. 622 (1986). This language shows that the legislature intended to reduce the liability of medical professionals by providing them with a manner in which they could satisfy their duties to warn. It would be contrary to our goal of advancing the policies of a statutory scheme to interpret RSA 329:31 as imposing on physicians a duty to warn potential suicide victims of their own threats to kill themselves. Doing so would increase, rather than decrease, physician liability by creating a potential cause of action for patients who subsequently commit suicide. For the above reasons, the trial court did not err in declining to adopt Dr. Jackson's interpretation of RSA 329:31 as a complete defense to liability in this case.

## B. RSA Chapter 627

Dr. Jackson argues that the plaintiff's professional negligence claim should not have gone to the jury because RSA chapter 627 (1996) provided a complete defense to civil liability. Dr. Jackson primarily relies on RSA 627:6, VI, which states: "A person acting under a reasonable belief that another person is about to commit suicide or to inflict serious bodily injury upon himself may use a degree of force on such person as he reasonably believes to be necessary to thwart such a result." Dr. Jackson argues that he sufficiently proved that he had a reasonable belief that the minimal force involved with protective custody was reasonably necessary to thwart the plaintiff's potential suicide. Dr. Jackson raised this argument in his motion for judgment notwithstanding the verdict below.

"Motions for directed verdict and motions for judgment notwithstanding the verdict are essentially the same, though made at different stages of the trial, and they are governed by identical standards." *Thompson v. The H.W.G. Group, Inc.*, 139 N.H. 698, 699, (1995). We therefore apply the same standard for sufficiency of the evidence that we used to address Frisbie's motion for directed verdict.

RSA 627:6, VI requires that the defendant believe that the degree of force he uses to thwart an attempt at suicide be reasonably necessary, which we determine using an objective standard. *State v. Leaf*, 137 N.H. 97, 99 (1993). A belief that is unreasonable, even though honest, will not support this defense. *Id.* It is for the jury to determine whether the belief, even though honest, was in fact reasonable under all the circumstances. *Id.*

■ For Dr. Jackson to prevail on appeal, he must show that the sole reasonable inference that may be drawn from the evidence presented at trial is that he objectively believed that he applied a degree of force reasonably necessary to thwart the plaintiff's attempt at suicide. To support his argument, Dr. Jackson simply states that whether his use of force was reasonably necessary "should be undisputed, as the plaintiff in fact did not commit suicide." We disagree. At trial, the plaintiff presented two expert witnesses who stated that there were less harmful ways in which Dr. Jackson could have treated the plaintiff and kept her safe from harm. These experts testified that Dr. Jackson violated his duty of care by placing the plaintiff in protective custody instead of pursuing other treatment options. Viewing this evidence in the light most favorable to the plaintiff, we find that the evidence is not so overwhelmingly in favor of the defendant that no contrary verdict could stand. The trial court, therefore, did not commit an unsustainable exercise of discretion when it denied Dr. Jackson's motion for judgment notwithstanding the verdict.

## C. Jury Charge

Dr. Jackson argues that the trial court's jury instruction regarding professional negligence was erroneous as a matter of law. Specifically, he asserts that the instruction: (1) erroneously imposed upon him a duty to hold the plaintiff against her will at the hospital; and (2) erroneously granted rights to caregivers, contrary to section IX of the PBR.

We review the jury instruction under the standard from *Broughton*, 152 N.H. at 556, that we set forth above.

The trial court gave the following jury instruction:

> Under New Hampshire law, a physician is authorized to use chemical and physical restraints on a patient when he or she authorizes it in writing, for a specific and limited time necessary to protect a patient or others from injury. In an emergency, restraints may be authorized by the designated professional staff member in order to protect the patient or others from injury.

This jury instruction is based upon section IX of the PBR, which states, in pertinent part:

The patient shall be free from chemical and physical restraints except when they are authorized in writing by a physician for a specific and limited time necessary to protect the patient or others from injury. In an emergency, restraints may be authorized by the designated professional staff member in order to protect the patient or others from injury.

RSA 151:21, IX.

■ Dr. Jackson points to no language in the disputed jury instruction that imposed a duty upon him, particularly any duty not already imposed by the PBR. Further, the words "duty" or "shall" are not present in the disputed instruction. Generally, it is the word "shall" that imposes a duty in statutory language. *American Exp. Travel v. Moskoff*, 144 N.H. 190, 191 (1999); *see also Town of Hudson v. Baker*, 133 N.H. 750, 752 (1990). Dr. Jackson does not explain why he believes the trial court's charge creates a duty, and we can find no language in the charge that does so.

■ Dr. Jackson next argues that the trial court's instruction granted rights to caregivers when the PBR does not grant any rights to caregivers to restrain patients contrary to the PBR. We conclude that Dr. Jackson has misinterpreted the PBR. The second sentence of the disputed instruction and the second sentence of section IX of the PBR are identical. Both grant caregivers the right to protect the patient or others from injury by restraining the patient. Since the trial court quoted from a statute allowing physicians to restrain patients, it is untenable for Dr. Jackson to argue that the instructions were erroneous because they misled the jury into thinking that physicians have a right to restrain patients.

We therefore conclude that Dr. Jackson failed to prove that the instruction inadequately explained the law applicable to the case in such a way that the jury could have been misled. The charge fairly presented the case to the jury such that no injustice was done to the legal rights of the parties.

### III. Patients' Bill of Rights

Frisbie argues that the trial court erred by interpreting the PBR as creating an independent cause of action. There was no basis, Frisbie asserts, for the trial court to find that the legislature intended to create a private right of action under the PBR that would be independent from a standard medical negligence claim. Frisbie relies upon *In re "K"*, 132 N.H. 4 (1989), for this proposition, arguing that this case states in dicta that the PBR does not purport to establish a standard of care in a professional negligence action under RSA chapter 507-E (1997).

We apply the standards for statutory interpretation that we set forth above. *Woodview*, 152 N.H. at 116; *Hughes*, 152 N.H. at 38-39.

■■ Frisbie's argument that the PBR does not establish a private right of action is incorrect. The PBR explicitly provides for private relief against a hospital. Entitled "Equitable and Other Relief," RSA 151:30 provides that "[d]amages shall be assessed in a proceeding against a facility which violates this subdivision and the facility shall be liable for . . . all damages proximately caused by the violations." RSA 151:30, II. Frisbie's reliance upon *In re "K"*, therefore, is misplaced, because the statutory language plainly establishes a private cause of action for violation of the PBR, which is separate from the question of whether there was professional negligence under RSA chapter 507-E.

*IV. Dr. Jackson's Deposition*

The defendants next argue that the trial court erred by declining to admit Dr. Jackson's discovery deposition as evidence. Both parties deposed Dr. Jackson in 2001. Several weeks before trial, however, he informed defense counsel by letter, with no return address, that he would not appear at trial. The defendants argue, in conclusory fashion, that the letter was sufficient to show that Dr. Jackson was "unavailable" pursuant to Rule 804(b)(1) of the New Hampshire Rules of Evidence.

We review a trial court's evidentiary rulings under an "unsustainable exercise of discretion" standard. *Carignan*, 151 N.H. at 416. We reverse the trial court's determination "only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case." *Id.*

Rule 804(b)(1) creates a hearsay exception for the prior testimony of an unavailable witness when the witness gave that testimony at another hearing or deposition. *Barrows v. Boles*, 141 N.H. 382, 394 (1996). A witness is "unavailable" when the witness "is absent from the hearing and the proponent of the witness' statement has been unable to procure the witness' attendance . . . by process or other reasonable means." N.H. R. Ev. 804(a)(5). Rule 804(a)(5), therefore, permits admission of a deposition only if the proponent adequately shows that he cannot procure the witness to testify. *LeBlanc v. Publow*, 129 N.H. 117, 120 (1987).

■■ The trial court found that the defendants did not adequately show that they could not procure the witness to testify, stating: "I interpret Rule 804 to require that efforts be made to procure the witness's attendance and, frankly, based on what I've heard, I don't believe there's been an adequate effort to procure the witness's testimony." We agree. The defendants did not argue at trial that they had no way of contacting Dr. Jackson. In fact, defense counsel admitted twice at trial that Dr. Jackson

had provided counsel with a post-office box at which to reach him. Defense counsel did not send a letter explaining the importance of Dr. Jackson's attendance at trial or attempt in any other manner to further communicate with him. It appears from the record that defense counsel received Dr. Jackson's letter and did nothing to persuade him to appear at trial. Based upon the above, we conclude that the trial court properly exercised its discretion by declining to admit Dr. Jackson's discovery deposition as evidence.

## V. Damages

### A. Emotional Distress and Reluctance to Seek Treatment

The defendants argue that the trial court erred by allowing a damage recovery for the plaintiff's claims of emotional distress and reluctance to seek treatment when no such instruction was before the jury. The plaintiff responds that the defendants waived this argument by failing to properly object at trial.

"It is well established that a party must make a specific and contemporaneous objection during trial to preserve an issue for appellate review. This requirement affords the trial court an opportunity to correct any error it may have made and is grounded in common sense and judicial economy." *Broughton*, 152 N.H. at 552 (citations omitted). All objections to a jury charge are waived unless taken on the record before the jury retires. SUPER. CT. R. 72; *Daigle v. City of Portsmouth*, 129 N.H. 561, 583 (1987).

The trial court gave a broad instruction on damages. The court stated that the damage award should be "full, fair and adequate" and that the award should compensate the plaintiff and make her whole. The trial court did not specifically instruct on emotional distress, reluctance to seek treatment, or on any other damage claim that the plaintiff made. After the jury instructions, the trial court gave both parties ample opportunity to object to the instructions. If the defendants wanted to exclude any consideration of emotional distress or reluctance to seek treatment in the damage award, they should have asked the court to instruct the jury that it could not award such damages. The defendants failed to do so. Because the defendants did not object to the instructions that permitted the jury to award damages for emotional distress or reluctance to seek treatment, the defendants are precluded from arguing that we should not consider such damage claims when reviewing the amount of damages awarded.

## B. Remittitur

The defendants finally argue that the trial court erred by denying their motion for remittitur. The defendants assert that the damage award was excessive.

A trial judge has the responsibility to review a verdict. *Carignan*, 151 N.H. at 415. The trial court may disturb the verdict as excessive if the amount is conclusively against the weight of evidence and if the verdict is manifestly exorbitant. *Id.* "The proper standard for the trial court's review of a jury award is whether the verdict is fair .... Whether remittitur is appropriate rests with the trial court's sound discretion. Absent an unsustainable exercise of discretion, we will not reverse the trial court's decision." *Id.* (citations omitted).

In determining the propriety of the damage award, the trial court considered uncontroverted evidence that the plaintiff was handcuffed and placed in a jail cell overnight. The trial court found that this experience restrained her liberty and created both a physical impact and a psychological impact. The trial court considered testimony from the plaintiff's therapist, who stated that the incarceration exacerbated the plaintiff's alcoholism. The therapist testified that the plaintiff suffered from feelings of shame and low self-esteem due to her incarceration. The therapist also testified that the plaintiff's experience at Frisbie, and subsequent incarceration, made treatment of her psychological issues more difficult, because the plaintiff became reluctant to trust medical professionals. A friend and employee of the plaintiff testified that, after the plaintiff's incarceration, her mental state deteriorated. The employee stated that the plaintiff missed work more frequently, reported feeling humiliated, experienced significant losses of both appetite and sleep, and, on multiple occasions, called the employee crying in the middle of the night. The plaintiff testified that, after the incarceration, her depression and thoughts of committing suicide intensified, she withdrew from social activities, her abuse of alcohol increased, and she resigned from her job at the Somersworth Fire Department because she anticipated being fired after showing up to work intoxicated. Based upon the above facts, we conclude that the trial court did not commit an unsustainable exercise of discretion in finding that the award was neither against the weight of evidence nor manifestly exorbitant.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and DUGGAN, JJ., concurred.