NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2013-469

NEW HAMPSHIRE ATTORNEY GENERAL

v.

BASS VICTORY COMMITTEE

Argued: May 8, 2014
Opinion Issued: October 15, 2014

Joseph A. Foster, attorney general (Anne M. Edwards, associate attorney general, and Brian W. Buonamano, attorney, on the brief, and Mr. Buonamano orally), for the New Hampshire Attorney General.

Douglas, Leonard & Garvey, P.C., of Concord (Charles G. Douglas, III and Jason R.L. Major on the brief, and Mr. Douglas orally), for Bass Victory Committee.

CONBOY, J. The New Hampshire Attorney General (AG) appeals an order of the Superior Court (McNamara, J.) dismissing his petition for civil penalties against the Bass Victory Committee (Committee), the authorized campaign committee of former United States Congressman Charles F. Bass, for allegedly violating RSA 664:16-a (2008) (amended 2014) by engaging in "push-polling." See RSA 664:21, VI (Supp. 2013). The AG argues that the trial court

erroneously determined that the Federal Election Campaign Act, 52 U.S.C. §§ 30101 et seq. (FECA),[*] preempts RSA 664:16-a.  We affirm.

## I.     Background

The following facts are drawn from the trial court's order or are otherwise undisputed on the record before us.  In September 2010, the AG's Office received information regarding polling telephone calls made to New Hampshire residents that were described as containing negative content about United States congressional candidate Ann McLane Kuster.  The AG investigated, and concluded that the Committee had engaged in "push-polling" as defined in RSA 664:2, XVII (2008) (amended 2014) without complying with the disclosure requirements set forth in RSA 664:16-a.

At the time of the AG's investigation, RSA 664:2, XVII defined "'push-polling'" as:

> (a) Calling voters on behalf of, in support of, or in opposition to, any candidate for public office by telephone; and
>
> (b) Asking questions related to opposing candidates for public office which state, imply, or convey information about the candidates['] character, status, or political stance or record; and
>
> (c) Conducting such calling in a manner which is likely to be construed by the voter to be a survey or poll to gather statistical data for entities or organizations which are acting independent of any particular political party, candidate, or interest group.

RSA 664:16-a provided:

> I.  Any person who engages in push-polling, as defined in RSA 664:2, XVII, shall inform any person contacted that the telephone call is being made on behalf of, in support of, or in opposition to a particular candidate for public office, identify that candidate by

---

[*] Effective September 1, 2014, the provisions of the FECA were transferred from Title 2 to Title 52 of the United States Code.  See Office of the Law Revision Counsel, United States Code, Editorial Reclassification Title 52, United States Code, available at http://uscode.house.gov/editorialreclassification/t52/index.html.  As of the date of this opinion, the printed version of Title 52 is not available and, therefore, we have not included dates in our citations to the FECA.  Transfer of the printed version of the Code will be effective in supplement II of the 2012 edition of the United States Code.  See id.

name, and provide a telephone number from where the push-polling is conducted.

II. Any person or entity who violates paragraph I shall be subject to penalty under RSA 664:21, V and VI.

According to the AG, the Committee violated RSA 664:16-a by asking questions in the polling calls about Kuster that implied or conveyed negative information about her character, status, political stance, or record in a manner that was likely to be construed by voters as a survey or poll to gather statistical data for an independent entity or organization without disclosing that the calls were made on behalf of the Committee. As a result, the AG filed a petition in Superior Court against the Committee, seeking statutory civil penalties pursuant to RSA 664:21. After unsuccessfully attempting to remove the case to federal court, the Committee moved to dismiss the AG's petition on the ground that RSA 664:16-a is preempted by the FECA. The Committee contended that the FECA contains an express preemption provision that demonstrates Congress's "explicit intent to preempt state law with regard to the entire field of election laws concerning campaigns for federal offices." The preemption provision states, subject to limitations not relevant here:

[T]he provisions of [the FECA], and of rules prescribed under [the FECA], supersede and preempt any provision of State law with respect to election to Federal office.

52 U.S.C. § 30143(a).

The Committee maintained that legislative history of the FECA demonstrates Congress's intent that the Act preempt state law with regard to reporting and disclosing political contributions and expenditures by federal candidates and political committees. The Committee also relied upon an advisory opinion by the Federal Election Commission (FEC) that concluded that RSA 664:16-a is preempted by the FECA because, if applied to candidates for federal office who want to pay for telephone surveys, as defined in RSA 664:2, XVII, the statute would impose additional disclosures as to those expenditures. See F.E.C. Adv. Op. 2012-10, 2012 WL 1529235, at *4 (F.E.C. Apr. 27, 2012). Thus, the Committee argued that RSA 664:16-a "interferes with the intent of Congress, by requiring a candidate for federal office to make disclosures regarding election-related expenditures" and, therefore, is preempted.

The trial court ruled that the FECA preempts RSA 664:16, concluding that "[p]ush-polling is a campaign expenditure because the campaign must expend funds in order to conduct the activity." The court ruled that, "[b]ecause [the] FECA regulates the required disclosures associated with campaign expenditures, and because RSA 664:16-a mandates disclosure associated with

3

a specific type of campaign expenditure, federal law preempts the state statute." The court therefore dismissed the AG's petition, and this appeal followed.

## II.     Standard of Review

The sole issue for our review is whether the trial court erred when it ruled that RSA 664:16-a is preempted by the FECA because push-polling is a campaign expenditure and the FECA regulates the required disclosures associated with campaign expenditures. "Generally, when reviewing a trial court's ruling on a motion to dismiss, we consider whether the [plaintiff's] allegations are reasonably susceptible of a construction that would permit recovery." Gray v. Kelly, 161 N.H. 160, 164 (2010) (quotation omitted). Because the trial court's determination of federal preemption is a matter of law, our review is de novo. See Appeal of Bretton Woods Tel. Co., 164 N.H. 379, 387 (2012); Carlisle v. Frisbie Mem. Hosp., 152 N.H. 762, 770 (2005).

We also review the trial court's statutory interpretation de novo. Pelkey v. Dan's City Used Cars, 163 N.H. 483, 487 (2012), aff'd, 133 S. Ct. 1769 (2013). The meaning of the FECA is a question of federal law, and we, therefore, interpret it in accordance with federal policy and precedent. Cf. id. When interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We do not read words or phrases in isolation, but in the context of the entire statutory scheme. Id.

## III.     Federal Preemption Principles

We begin by reviewing the general principles of federal preemption. The federal preemption doctrine is based upon the Supremacy Clause in Article VI of the United States Constitution. See Arizona v. United States, 132 S. Ct. 2492, 2500 (2012); Appeal of Sinclair Machine Prod's, Inc., 126 N.H. 822, 826 (1985). Article VI provides that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." Arizona, 132 S. Ct. at 2500. "Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quotation, brackets and ellipsis omitted). "Accordingly, the purpose of Congress is the ultimate touchstone of pre-emption analysis." Id. (quotation and brackets omitted).

4

To that end, courts look to the language of the pre-emption statute and the statutory framework surrounding it as well as the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect interested parties.

Janvey v. Democratic Senatorial Campaign Committee, 793 F. Supp. 2d 825, 838 (N.D. Tex. 2011) (quotations omitted), aff'd, 712 F.3d 185 (5th Cir. 2013).

"Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose." Cipollone, 505 U.S. at 516 (quotation omitted). "Explicit statutory or regulatory language provides the clearest expression of preemptive intent." Janvey, 793 F. Supp. 2d at 838.

"When Congress has spoken expressly . . . the preemptive scope of a federal law is governed entirely by the express language." Weber v. Heaney, 995 F.2d 872, 875 (8th Cir. 1993). As the Supreme Court explained in Cipollone:

When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.

Cipollone, 505 U.S. at 517 (quotations and citation omitted).

Since "[p]reemption of any type fundamentally is a question of congressional intent," Teper v. Miller, 82 F.3d 989, 993 (11th Cir. 1996) (quotation omitted), our preemption analysis begins with the source of the alleged preemption. See DerGazarian v. Dow Chemical Co., 836 F. Supp. 1429, 1431 (W.D. Ark. 1993). We, therefore, turn to an examination of the relevant sections of the FECA.

IV.     The FECA

Originally enacted in 1971, the FECA sets forth "an intricate federal statutory scheme governing campaign contributions and expenditures related to federal elections." Teper, 82 F.3d at 994; see Weber, 995 F.2d at 875. Its "primary purpose . . . is to regulate campaign contributions and expenditures in order to eliminate pernicious influence — actual or perceived — over candidates by those who contribute large sums" of money. Karl Rove & Co. v. Thornburgh, 39 F.3d 1273, 1281 (5th Cir. 1994). To this end, "[t]he FECA

5

imposes limits and restrictions on contributions; provides for the formation and registration of political committees; and mandates reporting and disclosure of receipts and disbursements made by such committees." Bunning v. Com. of Ky., 42 F.3d 1008, 1011 (6th Cir. 1994) (referring to provisions in the FECA dealing with the organization, registration, and reporting requirements for political committees). The FECA defines "[t]he term 'expenditure'" to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A)(i).

"The FECA also created the [FEC], which is empowered with the administration and enforcement of the Act." Bunning, 42 F.3d at 1011. "Congress delegated the FEC extensive rulemaking and adjudicative powers and authorized it to prescribe rules and regulations to carry out the provisions of [the] FECA." Weber, 995 F.2d at 875 (quotation and citation omitted). "The FEC also is empowered to give advisory opinions when requested." Id.; see 52 U.S.C. §§ 30107(a)(7), 30108.

The critical language in the preemption provision states that the FECA shall "preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a). "While at first blush, [the preemption provision] appears to have an exceedingly broad scope, courts have not interpreted [it] in that manner." Krikorian v. Ohio Elections Comm'n, No. 1:10CV103, 2010 WL 4117556, at *10 (S.D. Ohio Oct. 19, 2010). "Rather, courts have recognized that [the provision] is ambiguous and have given [it] a narrow preemptive effect in light of its legislative history." Id. (quotations omitted); see Karl Rove & Co., 39 F.3d at 1280; Weber, 995 F.2d at 875.

To determine whether the scope of the preemption provision is broad enough to preclude enforcement of RSA 664:16-a against federal candidates and political committees, we must "identify the domain expressly [preempted]." Bunning, 42 F.3d at 1011 (quotation omitted); see Cipollone, 505 U.S. at 517. Because the preemption provision is ambiguous, we look to its legislative history. See ATV Watch v. N.H. Dep't of Resources & Econ. Dev., 155 N.H. 434, 437 (2007).

The preemption provision, enacted in 1974, "replaced a prior version [of the statute] which expressly saved state laws from preemption, except where compliance with state law would result in a violation of the FECA, or would prohibit conduct permitted by the FECA." Bunning, 42 F.3d at 1012. "The House Committee that drafted the current provision intended 'to make certain that the Federal law is construed to occupy the field with respect to elections to Federal office and that the Federal law will be the sole authority under which such elections will be regulated.'" Teper, 82 F.3d at 994 (quoting H.R. Rep. No. 1239, at 10 (1974)). Significantly, the legislative history reveals that Congress

intended "Federal law [to] occup[y] the field with respect to reporting and disclosure of political contributions to and expenditures by Federal candidates and political committees." S. Rep. No. 93-1237 (1974) (Conf. Rep.), reprinted in 1974 U.S.C.C.A.N. 5587, 5668 (emphasis added).

The preemption provision "incorporates by reference 'rules prescribed under' [the] FECA," and, pursuant to its authority, "[t]he FEC has issued a regulation interpreting the scope of [this provision] in accordance with the statute's plain language and its legislative history." Krikorian, 2010 WL 4117556, at *11; see 11 C.F.R. § 108.7 (2014). That regulation provides:

(a) The provisions of the Federal Election Campaign Act of 1971, as amended, and rules and regulations issued thereunder, supersede and preempt any provision of State law with respect to election to Federal office.

(b) Federal law supersedes State law concerning the —

(1) Organization and registration of political committees supporting Federal candidates;

(2) Disclosure of receipts and expenditures by Federal candidates and political committees; and

(3) Limitation on contributions and expenditures regarding Federal candidates and political committees.

(c) The Act does not supersede State laws which provide for the —

(1) Manner of qualifying as a candidate or political party organization;

(2) Dates and places of elections;

(3) Voter registration;

(4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;

(5) Candidate's personal financial disclosure; or

(6) Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

7

11 C.F.R. § 108.7. Thus, our examination of the language of the preemption provision itself and its interpretative regulation, along with the legislative history of the FECA, demonstrates that the FECA preempts laws related to federal campaign expenditures and <u>disclosure</u> of such expenditures.

V.     Application of the Preemption Provision to RSA 664:16-a

The AG argues that the FECA does not preempt RSA 664:16-a because the FECA governs campaign expenditures and "RSA 664:16-a constitutes a disclaimer requirement, not a statute regarding campaign expenditures." The Committee disagrees, contending that RSA 664:16-a is preempted by the FECA to the extent it applies to <u>disclosures</u> of campaign <u>expenditures</u> by federal candidates and political committees because "[d]isclosures concerning the financing or control of polling efforts like those at issue in this case are <u>not</u> among the narrow categories of legitimate state regulation that escape the ambit of" the preemption provision. Although we recognize that there is a "strong presumption against pre-emption," <u>Cipollone</u>, 505 U.S. at 523, and that "courts have given [the preemption provision] a narrow preemptive effect in light of its legislative history," <u>Karl Rove & Co.</u>, 39 F.3d at 1280 (quotation omitted), we nonetheless conclude that RSA 664:16-a, as applied to election to federal office, falls within the scope of the preemption provision.

On its face, RSA 664:16-a does not fit neatly within the ambit of any of the areas specifically preempted or excepted in 11 C.F.R. § 108.7. Indeed, RSA 664:16-a "is intended to insure that the public is fully informed when candidates engage in push-polling" by requiring "candidates [to] be fully accountable for the statements and messages generated by their campaigns." Laws 1998, 12:1. The statute's aim, therefore, is to prevent the "adverse impact on the political process" caused by anonymous push-polling. <u>Id</u>. "Nonetheless, it is the <u>effect</u> of the state law that matters in determining preemption, not its intent or purpose." <u>Teper</u>, 82 F.3d at 995. "Under the Supremacy Clause, state law that in effect substantially impedes or frustrates federal regulation, or trespasses on a field occupied by federal law, must yield, no matter how admirable or unrelated the purpose of that law." <u>Id</u>.

Here, the version of RSA 664:16-a in effect at the time the AG brought this action required the Committee to disclose that the telephone calls were "being made on behalf of, in support of, or in opposition to a particular candidate for public office, identify that candidate by name, and provide a telephone number from where the push-polling is conducted." RSA 664:16-a, I. The effect of requiring such disclaimers is to reveal the identity of the sponsor of the telephone calls, <u>i.e.</u>, to disclose who is paying for the calls. In this way, RSA 664:16-a imposes a disclosure requirement on campaign expenditures related to the election of a candidate for federal office.

8

The AG argues that RSA 664:16-a "does not directly limit campaign spending in the area of telephone surveys" and that, "[w]hile undoubtedly it is true that funds are expended to conduct polls, this does not support or suggest the conclusion that requiring a disclaimer be included in the script of a poll limits the amount of money that can be spent on polling activity." (Emphasis added.) The AG's argument, however, addresses only a part of the domain regulated by the FECA. The FECA not only preempts laws that regulate limits on campaign expenditures by federal political committees, but also those that regulate "[d]isclosure of . . . expenditures by . . . political committees." 11 C.F.R. § 108.7(b)(2) (emphasis added). Indeed, our discussion of the FECA's legislative history above makes clear that Congress intended the FECA to occupy "the field with respect to . . . disclosure of political contributions to and expenditures by Federal candidates and political committees." S. Rep. No. 1237 (Conf. Rep.). Moreover, the title of subchapter one of the FECA is entitled "Disclosure of Federal Campaign Funds." See Bourne v. Sullivan, 104 N.H. 348, 352-53 (1962) (title of act not conclusive, but significant when considered in connection with legislative history). The logical effect of the requirements in RSA 664:16-a is to require disclosure of expenditures. Accordingly, we conclude that RSA 664:16-a, as applied to a federal candidate or political committee, is preempted by the FECA.

We note that our conclusion is in accord with the FEC advisory opinion addressing the precise issue here. See F.E.C. Adv. Op. 2012-10, 2012 WL 1529235, at *2; see also 52 U.S.C. § 30108(C). The FEC concluded that RSA 664:16-a, I, is preempted by the FECA and the FEC's regulations "with respect to the proposed telephone surveys made on behalf of Federal candidates, their authorized committees, or other Federal political committees that refer only to candidates for Federal office." Id. According to the FEC:

> The legislative history of the [FECA] makes clear that Congress intended to make certain that the Federal law is construed to occupy the field with respect to elections to Federal office and that the Federal law will be the sole authority under which such elections will be regulated. . . . Federal law occupies the field with respect to reporting and disclosure of political contributions to, and expenditures by, Federal candidates and political committees, but does not affect State laws as to the manner of qualifying as a candidate, or the dates and places of elections.
>
> . . . .
>
> Here, [RSA 664:16-a], if applied to Federal candidates who wish to pay for the telephone surveys described in the request, would impose an additional disclaimer requirement on those

9

expenditures. Under the Act's preemption clause, only Federal law may require disclosure regarding expenditures by Federal candidates.

Id. at *2, 4 (quotation omitted).

We recognize that our decision prevents the AG from enforcing RSA 664:16-a against a federal candidate or committee. Nor can the AG bring a private action against a federal candidate or committee under the FECA. See 52 U.S.C. §§ 30106(b)(1), 30107(e), 30109. Nonetheless, the absence of a direct cause of action alone is no bar to preemption if, as in this case, Congress has manifested a clear intention to preempt certain state law causes of action. Cf. Pelkey, 163 N.H. at 496 (noting that absence of any federal remedy for private injuries of the kind allegedly suffered supported conclusion that federal law did not preempt state law). Moreover, although the AG cannot bring an action under RSA 664:16-a because the FEC has "exclusive jurisdiction over enforcing" the provisions of the FECA, Kean for Congress Committee v. Federal Election, 398 F. Supp. 2d 26, 28 (D.D.C. 2005); see 52 U.S.C. § 30106(b)(1), we note that the FECA "permits 'any person' to file a signed, sworn administrative complaint with the FEC alleging a violation of [the] FECA." Kean, 398 F. Supp. 2d at 28-29; see 52 U.S.C. § 30109(a)(1).

Citing the exceptions to preemption in 11 C.F.R. § 108.7(c), the AG maintains that "[f]ederal regulations establish that a state may regulate federal campaigns directly and specifically, even if it regulates activities that are paid for by the campaign." To the extent that the exceptions in section 108.7(c) "regulate federal campaigns directly and specifically," however, those exceptions are grounded in the constitutional authority granted to States to regulate broad election matters related to the voting process itself — matters unrelated to campaign expenditures. See Cook v. Gralike, 531 U.S. 510, 523 (2001).

The United States Supreme Court has explained that States have no inherent authority to regulate elections to federal office. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 804, 833-34 (1995). Rather, "powers over the election of federal officers had to be delegated to, rather than reserved by, the States." Id. The Elections Clause to the United States Constitution delegated to the States the power to regulate the "times, places and manner of holding elections for Senators and representatives." U.S. CONST. art. I, § 4. The Supreme Court has construed this clause to grant states "'broad power' to prescribe the procedural mechanisms for holding congressional elections." Cook, 531 U.S. at 523. These procedural mechanisms encompass "matters like notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." Id. at 523-24

(quotation omitted).  Thus, the exceptions in section 108.7(c) "merely acknowledge a long-standing constitutional dichotomy concerning which aspects of federal elections the states may regulate."  Dewald v. Wriggelsworth, 748 F.3d 295, 308 (6th Cir. 2014) (Cole, J., dissenting).

The AG also cites the FEC's decision in In the Matter of Democratic Congressional Campaign Committee to argue that "the FEC has explicitly found that polling activities are not subject to [the] FECA's disclaimer requirements."  See In the Matter of Democratic Congressional Campaign Committee & a., MUR 5835 (F.E.C. July 1, 2009), available at http://eqs.fec.gov/eqsdocs/29044244624.pdf.  In that decision, the FEC determined that survey research (referred to as "polls") conducted over the telephone on behalf of a political committee does not require disclaimers under the FECA.  Id. at 1, 4.  That decision, however, examined the reach of former 2 U.S.C. § 441d (2012), now reclassified as 52 U.S.C. § 30120, dealing with the publication and distribution of statements and solicitations, a provision of the FECA not at issue in this case.  Moreover, the FEC distinguished the polls at issue in that case, which it referred to as "legitimate forms of survey research," from the push-polls alleged to have occurred in this case, which the FEC described as "a survey instrument containing questions which attempt to change the opinion of contacted voters, generally by divulging negative information about the candidate which is designed to push the voter away from him or her and pull the voter toward the candidate paying for the polling."  Id. at 10 (quotation omitted).  Since the FEC addressed only the disclaimer requirements for the former type of polls, we decline to find its decision applicable in this case.

The AG further contends that our determination in this case "must be made by reference to [the] FECA's own expenditure regulations and whether consideration of RSA 664:16-a duplicates . . . those expenditure regulations."  We disagree.  "Nothing in the language of" the preemption provision "suggests that [the] FECA's pre-emption is limited to inconsistent state regulation."  Weber, 995 F.2d at 876 n.4 (quotations omitted).  "Thus, supplemental and consistent state regulation is preempted as well."  Id.

Nor are we persuaded by the AG's argument that if RSA 664:16-a is preempted by the FECA, then "virtually all state statutes that in any way involve expenditures by a campaign committee would be preempted."  Our task here is to determine whether RSA 664:16-a requires disclosure of campaign expenditures such that it falls within the boundaries of the preemption provision.  We have concluded that it does.  Whether other statutes involve campaign expenditures so as to be similarly preempted does not control our analysis, and we express no opinion with respect to the preemption of any other state statutes.

The AG cites several cases from other jurisdictions in which courts have not found preemption "[e]ven where state regulations deal with the transfer of funds or involve transactions that could, in theory, affect expenditures." See Janvey v. Democratic Senatorial Campaign Committee, 712 F.3d 185 (5th Cir. 2013); Karl Rove & Co., 39 F.3d 1273; Stern v. General Elec. Co., 924 F.2d 472 (2d Cir. 1991); United States v. Trie, 21 F. Supp. 2d 7 (D.D.C. 1998); State v. Jude, 554 N.W.2d 750 (Minn. Ct. App. 1996). However, these cases are inapposite because they pertain to state laws that did not regulate expenditures or disclosure of expenditures related to election to federal office.

For instance, Janvey involved a suit brought under the Texas Uniform Fraudulent Transfer Act (TUFTA) against several national political committees to recover certain political contributions made to the committees alleged to be made as fraudulent conveyances. Janvey, 712 F.3d at 189. In that case, the Fifth Circuit Court of Appeals concluded that the claim brought under the TUFTA was not preempted by the FECA because the "TUFTA is a general state law that happen[ed] to apply to [the] federal political committees in [that] case." Id. at 200. Similarly, in Karl Rove & Company, the Fifth Circuit "rejected a federal candidate's argument that FECA preempted a company's state law cause of action against him for the debts of his campaign committee," id.; see Karl Rove & Co., 39 F.3d at 1280, finding that the preemption provision did not "stretch . . . far enough to create a preemptive bar to applying state law to hold federal candidates personally liable" for such debts. Karl Rove & Co., 39 F.3d at 1280.

Likewise, in Stern, the Second Circuit Court of Appeals addressed whether state law corporate waste claims based upon a corporation's use of funds to support federal political campaigns were preempted by the FECA. Stern, 924 F.2d at 474. Noting that the preemption provision of the FECA "relates only to state-law provisions with respect to election to Federal office," the court explained that "[t]he narrow wording of this provision suggests that Congress did not intend to preempt state regulation with respect to non-election-related activities." Id. at 475 (quotation omitted). The court concluded that the FECA did not "preclude New York from pursuing its independent interest in ensuring that corporate directors exercise sound judgment in the expenditure of corporate funds," and that the state law corporate waste claims were not preempted. Id. The courts in other cases cited by the AG reached similar conclusions. See also Trie, 21 F. Supp. 2d at 18-19 (denying defendant's motion to dismiss certain counts in indictment brought under general felony statute on preemption grounds because Congress did not express any intent that misdemeanor sanctions of FECA to be a substitute for all other possible criminal sanctions); Jude, 554 N.W.2d at 753, 752 (finding that FECA does not preempt state law prohibiting "false campaign advertisements, and other false statements in the course of a campaign" because law "merely prohibits certain nonfinancial campaign practices").

Unlike the state laws examined in those cases, the effect of RSA 664:16-a is to mandate a disclosure requirement upon campaign expenditures.

VI.     Conclusion

In summary, we conclude that RSA 664:16-a imposes a disclosure requirement on campaign expenditures related to the election of a candidate for federal office.  Accordingly, we hold that the FECA preempts RSA 664:16-a as applied to federal candidates and political committees.

Affirmed.

DALIANIS, C.J., and HICKS, J., concurred.