SELYA, Circuit Judge.
The spiraling cost of brand-name prescription drugs is a matter of great concern to government at every level. New Hampshire has attempted to curb this escalating problem by enacting innovative legislation. Certain affected companies have challenged New Hampshire’s legislative response, and that challenge raises important constitutional questions that lie at the intersection of free speech and cyberspace. The tale follows.
Pharmaceutical sales representatives, known in industry argot as “detailers,” earn their livelihood by promoting prescription drugs in one-on-one interactions with physicians. A valuable tool in this endeavor, available through the omnipresence of computerized technology, is knowledge of each individual physician’s prescribing history. With that informational *45 asset, detailers are able to target particular physicians and shape their sales pitches accordingly. Convinced that this detailing technique induces physicians to prescribe expensive brand-name drugs in place of equally effective but less costly generic drugs, New Hampshire enacted a law that among other things prohibited certain transfers of physicians’ prescribing histories for use in detailing. See 2006 N.H. Laws § 328, codified at N.H.Rev.Stat. Ann. §§ 318:47-f, 318:47-g, 318-B:12(IV) (2006) (the Prescription Information Law). A duo of data miners promptly challenged the law as invalid on various grounds. The district court found that it worked an unconstitutional abridgement of free speech and enjoined its enforcement. See IMS Health Inc. v. Ayotte, 490 F.Supp.2d 163, 183 (D.N.H.2007) (D.Ct.Op.). This appeal ensued.
In the pages that follow, we explain why we are not persuaded that the regulated data transfers embody restrictions on protected speech. In our view, the portions of the law at issue here regulate conduct, not speech. Unlike stereotypical commercial speech, new information is not filtered into the marketplace with the possibility of stimulating better informed consumer choices (after all, physicians already know their own prescribing histories) and the societal benefits flowing from the prohibited transactions pale in comparison to the negative externalities produced. This unusual combination of features removes the challenged portions of the statute from the proscriptions of the First Amendment.
There is a second basis for our decision. Even if the Prescription Information Law amounts to a regulation of protected speech — a proposition with which we disagree — it passes constitutional muster. In combating this novel threat to the cost-effective delivery of health care, New Hampshire has acted with as much forethought and precision as the circumstances permit and the Constitution demands.
I. BACKGROUND
The raw facts are largely undisputed. Modern-day detailing begins when a prescription is filled.[1] At that moment, the pharmacy stores in its computerized database a potpourri of information about the transaction, such as the name of the patient, the identity of the prescribing physician, the drug, its dosage, and the quantity dispensed. Due to the complex relationships that mark the delivery of health care products and services in the twenty-first century, this information quickly finds its way into other databases, including those of insurance carriers and pharmacy benefits managers.
The plaintiffs in this case, IMS Health Inc. and Verispan, LLC, are in the business of data mining. For present purposes, that means that they purchase data of the type and kind described above, aggregate the entries, group them by pres-criber, and cross-reference each physician’s prescribing history with physician-specific information available through the American Medical Association. The final product enumerates the prescriber’s identity and speciality, the drug prescribed, and kindred information. The scope of the enterprise is mind-boggling: these two plaintiffs alone record, group, and organize several billion prescriptions each year. To protect patient privacy, prescribees’ names are encrypted, effectively eliminating the ability to match particular prescriptions with particular patients.
*46 These massive collections of information have great utility for certain non-profit entities (e.g., educational institutions, public interest groups, and law enforcement agencies). New Hampshire’s concern, however, is with a frankly commercial use: the exploitation of the mined data by pharmaceutical companies, whose detailers use it in marketing drugs to physicians.
At this point, the art of detailing warrants further elaboration. Detailing involves tailored one-on-one visits by pharmaceutical sales representatives with physicians and their staffs. This is time-consuming and expensive work, not suited to the marketing of lower-priced bioe-quivalent generic drugs (drugs that are pharmacologically indistinguishable from their brand-name counterparts save for potential differences in rates of absorption). The higher profit margins associated with brand-name drugs leaves the personal solicitation field open to brand-name drug manufacturers, who in the year 2000 spent roughly $4,000,000,000 on detailing.[2]
Brand-name drug manufacturers engage in detailing in several situations. For instance, detailing is employed where a manufacturer seeks to encourage prescription of a patented brand-name drug as against generic drugs, or as against a competitor's patented brand-name drug, or as a means of maintaining a physician’s brand loyalty after its patent on a brand-name drug has expired.
If a physician’s prescribing habits present an appropriate opportunity, the detail-er attempts to gain access to the physician’s office, usually by presenting herself as a helpful purveyor of pharmaceutical information and research. The detailer comes to the physician’s office armed with handouts and offers to educate the physician and his staff about the latest pharmacological developments. In other words, detailers open doors by holding out the promise of a convenient and efficient means for receiving practice-related updates.
Withal, a physician’s time is precious, and detailers must manage their way around physicians’ natural reluctance to make time for promotional presentations. To this end, detailers typically distribute an array of small gifts to physicians and their staffs, host complimentary lunches, and pass out free drug samples. From time to time, a detailer will invite a physician to attend an all-expense-paid conference or to accept a lucrative speaking engagement.
Most of these freebies cut very little ice. The free samples, however, are highly prized. Their sheer volume is astounding: in the year 2000, an estimated $1,000,000,000 in free drug samples flowed from detailers to physicians. That flood of free medications enables physicians to offer drugs free of charge to selected patients. Many physicians thus tolerate detailing visits in order to reap the harvest of samples that these visits bring.[3]
Once inside a physician’s office, detailers are capable of mounting an impressively sophisticated and intense marketing pitch. The detailer works to establish an ongoing relationship with the physician and, in *47 most cases, detailers’ visits become a regular occurrence. For example, the average primary care physician interacts with no fewer than twenty-eight detailers each week and the average specialist interacts with fourteen.
Given the frequency of these exchanges, it is not surprising that prescriber-identifiable information can be an invaluable asset to the detailer. That information enables the detailer to zero in on physicians who regularly prescribe competitors’ drugs, physicians who are prescribing large quantities of drugs for particular conditions, and “early adopters” (physicians with a demonstrated openness to prescribing drugs that have just come onto the market). The information also allows the de-tailer to tailor her promotional message in light of the physician’s prescribing history.
II. THE LEGISLATIVE RESPONSE
In time, the New Hampshire legislature moved to combat what it saw as a pernicious effect of detailing. On January 4, 2006, a bill, which would become the Prescription Information Law, was introduced in the House of Representatives. Hearings before the House and Senate followed. Those hearings made the goals of the proposed statute pellucid: the protection of privacy interests, the safeguarding of patient health, and cost containment. Testimony taken at the hearings indicated that the last of these was the bill’s driver.
In due course, the proposed bill passed both chambers, was signed by the governor, and took effect on June 30, 2006. In relevant part it provides:
Records relative to prescription information containing patient-identifiable and prescriber-identifiable data shall not be licensed, transferred, used, or sold by any pharmacy benefits manager, insurance company, electronic transmission intermediary, retail, mail order, or Internet pharmacy or other similar entity, for any commercial purpose, except for the limited purposes of pharmacy reimbursement; formulary compliance; care management; utilization review by a health care provider, the patient’s insurance provider or the agent of either; health care research; or as otherwise provided by law. Commercial purpose includes, but is not limited to, advertising, marketing, promotion, or any activity that could be used to influence sales or market share of a pharmaceutical product, influence or evaluate the prescribing behavior of an individual health care professional, or evaluate the effectiveness of a professional pharmaceutical detailing sales force.
N.H.Rev.Stat. Ann. § 318:47-f.
The statute further provides that nothing contained in this language should be read to prohibit the dispensing of prescription medications to a patient, the transmission of prescription information either between a prescribe!' and a pharmacy or between pharmacies, the transfer of prescription records evident to a pharmacy’s change in ownership, the distribution of care management materials to a patient, or the like. Id. The statute makes explicit that nothing in the above-quoted language should be read to “prohibit the collection, use, transfer, or sale of patient and pres-criber de-identified data by zip code, geographic region, or medical specialty for commercial purposes.” Id. Last — but surely not least — it provides both criminal and civil penalties for violations. Id. §§ 318:55, 358-A:6.
III. THE LITIGATION
Within a month of the effective date of the Prescription Information Law, the plaintiffs initiated this constitutional challenge. They filed a civil action in the United States District Court for the Dis *48 trict of New Hampshire, naming the Attorney General in her official capacity as the defendant and seeking declaratory and in-junctive relief. Their complaint alleged that the statutory ban on transfer and use of prescriber-identifiable information transgressed the Free Speech Clause of the First Amendment, was void for vagueness, and offended the Commerce Clause.
A period of expedited discovery and a four-day bench trial ensued. The district court took the matter under advisement and subsequently wrote a thoughtful re-script in which it concluded that the Prescription Information Law regulated speech, not conduct. D. Ct. Op., 490 F.Supp.2d at 174-75. Accordingly, it applied the conventional constitutional test for commercial speech, inquiring whether the law (i) supported a substantial government interest, (ii) directly advanced that interest, and (iii) was more extensive than necessary to serve that interest. Id. at 177 (citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)).
The district court found the governmental interests advanced in support of the law insufficient. Id. at 178-81 & n. 13. With specific reference to cost containment, the court maintained that the state had failed to prove that substituting non-bioequivalent generic drugs for brand-name drugs would be generally advantageous to patients’ health. Id. at 180-81. The court also said that cost containment could not satisfy the third prong of the Central Hudson test because so many other regulatory options existed for curtailing detailing — none of which would involve restrictions on speech. See id. at 181-83 (listing continuing medical education, gift bans, and possible revisions of the state’s Medicaid program).
In the end, the court declared the relevant portions of the Prescription Information Law unconstitutional and enjoined its enforcement. Id. at 183. The court did not reach the plaintiffs’ other constitutional challenges.
This timely appeal followed. The issues raised engender de novo review. See Bose Corp. v. Consumers Union, 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 209 (1st Cir.2006).
IV. STANDING
“Standing is a threshold issue in every federal case.” Berner v. Delahanty, 129 F.3d 20, 23 (1st Cir.1997). It bears directly upon a court’s power to adjudicate a dispute. Id. Consequently, we first address an issue of standing — an issue that touches upon the nature of the conduct that should serve as the focal point of our inquiry.
New Hampshire has sought to improve the quality of interactions between detail-ers and physicians by regulating upstream transactions of prescriber-identifiable information between data miners and those who would put that information to use in detailing. The state directs our attention to these prohibited upstream transactions, claiming that they comprise the relevant conduct for present purposes. The plaintiffs demur, positing that the relevant conduct is composed of the downstream interactions between detailers and physicians because it is those interactions that the legislature intended to affect. The district court sided with the plaintiffs on this point. See D. Ct. Op., 490 F.Supp.2d at 175.
The record reveals that three sets of transactions are interwoven here. These include (i) the data miners’ acquisition of prescriber-specific information from pharmacies and others; (ii) the data miners’ sale of that information (now processed) to pharmaceutical companies for use in de *49 tailing (transfers for other purposes are exempted); and (iii) the use of that information by pharmaceutical company detail-ers to promote particular products to physicians. New Hampshire chose to regulate the first and second of these transactional subsets, not the third. Given this model, basic principles of standing jurisprudence help us to resolve this preliminary dispute.
“A party ordinarily has no standing to assert the First Amendment rights of third parties.” Wine & Spirits Retailers, Inc. v. Rhode Island (Wine & Spirits I), 418 F.3d 36, 49 (1st Cir.2005); accord Eulitt ex rel Eulitt v. Me. Dep’t of Educ., 386 F.3d 344, 351 (1st Cir.2004). No pharmaceutical company, detailer, or physician is a party in this case.[4] It follows that unless they can come within some exception to the general jus teriii principle, the plaintiffs lack standing to assert the First Amendment rights of the participants in the targeted downstream (third-stage) interactions. In other words, they cannot assert the rights of detailers to use pres-criber-identifiable information in communicating face-to-face with physicians, nor can they assert the rights of physicians to receive that information during such interactions. Cf. U.S. West, Inc. v. FCC, 182 F.3d 1224, 1232 (10th Cir.1999) (considering commercial speech rights where the plaintiff directly sought to use the information for its own marketing).
The plaintiffs convinced the district court that the exception laid down in Craig v. Boren, 429 U.S. 190, 194-95, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), allowed their assertion of third-party rights. See D. Ct. Op., 490 F.Supp.2d at 175 n. 10 (citing Craig for the proposition that vendors may assert the rights of their customer base). We think that in so concluding the court lost sight of the narrowness of this jus tertii exception. See Wine & Sprits I, 418 F.3d at 49 (characterizing the exception as “isthmian” and refusing to allow franchisor to assert First Amendment rights of franchisees).
The exception is rooted in practical considerations. Under it, a litigant will be permitted to raise a third party’s rights only when three criteria are met: the third party has suffered a constitutional injury in fact, the litigant enjoys a close relationship with the third party, and an obstacle exists to the third party assertion of his or her own rights. See Powers v. Ohio, 499 U.S. 400, 410-11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citing Craig, 429 U.S. at 190, 97 S.Ct. 451).
The inapplicability of the exception is evident. There is no indication in the record that pharmaceutical companies, de-tailers, or physicians are somehow incapable of or inhibited from vindicating their own rights. In the absence of any such barrier, Craig does not pertain. See Eulitt, 386 F.3d at 352-53; see also Singleton v. Wulff 428 U.S. 106, 110, 114-16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).
Of course, the Court has indicated some willingness to relax third-party standing in the First Amendment context. See Kowalski v. Tesmer, 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). But in practical terms, this relaxation evinces nothing more than a receptiveness to facial attacks on allegedly overbroad laws. See Osediacz v. City of Cranston, 414 F.3d 136, 140 (1st Cir.2005). Otherwise, hin *50 drance — the existence of an obstacle to the vindication of one’s own rights — remains a necessary prerequisite; and no court has exhibited a willingness to write the hindrance element out of the standing test as a matter of general convenience.[5] See Wine & Spirits I, 418 F.3d at 49; Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third Party Standing, 113 Harv. L.Rev. 1321, 1359-64 (2000); see also Osediacz, 414 F.3d at 140 n. 2 (noting that “[e]ven this limited relaxation ... is controversial”). Thus, the data miners must assert their own rights and explain how those rights are infringed by the operation of the Prescription Information Law.
As we proceed, we restrict our analysis to whether the data miners’ activities — the acquisition, aggregation, and sale of pres-criben — identifiable data-constitute speech or conduct and whether New Hampshire’s legitimate governmental interests are sufficient to counterbalance any speech rights inherent therein. We think it important to note, however, that this restriction on jus tertii rights does not prevent consideration of New Hampshire’s interest in combating detailing. Standing rules are at bottom a limitation on a court’s competence to adjudicate a dispute. See Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Conversely, consideration of a state’s interest addresses the state’s power to enact laws and is in no way denigrated by a lack of standing. After all, courts long have recognized that a law may be predicated on criteria broader than those presented by a particular case. See, e.g., Crawford v. Marion Cty. Election Bd., — U.S. -, 128 S.Ct. 1610, 1623, 170 L.Ed.2d 574 (2008); Gonzales v. Raich, 545 U.S. 1, 17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005).
Y. SPEECH OR CONDUCT?
The next issue requires a determination of whether or not the challenged portions of the Prescription Information Law regulate protected speech. The state offers a simplistic solution to this nuanced problem: it asseverates that the law falls under the exception to First Amendment coverage limned in Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001), so that it may prohibit the use of prescriber-identifiable information without further ado. See id. at 526-27, 121 S.Ct. 1753 (dictum).
Bartnicki does not take the state very far. The Bartnicki Court confronted a bizarre situation, in which an illegally intercepted wire communication fell fortuitously into the hands of an individual who had neither played a role in its interception nor knew the interceptor. Given that the information bore upon a matter of public concern, the Court opined that Congress could not constitutionally prohibit the disclosure of that information by the innocent recipient. Id. at 534, 121 S.Ct. 1753. In so concluding, it introduced a distinction between “use” and “disclosure” of illegally intercepted communications: *51 the First Amendment allowed absolute prohibition of the former but only allowed prohibition of the latter when the discloser had participated in the interception. Id. at 529, 121 S.Ct. 1753. It carefully distinguished the situation at hand from other situations in which valid laws prohibited the use of illegally intercepted wire communications. See id. at 527 n. 10, 121 S.Ct. 1753.
The state does not explain why Bart-nicki should be understood to shed light on the instant case, and we believe that any comparison is inapt. The facts of the two cases are materially distinguishable, and the state’s expansive reading of Bart-nicki is insupportable on policy grounds. Were the state capable of forbidding every use of information regardless of the specific nature of either the use or the information, the state’s power to control the flow of information would be nearly absolute. The First Amendment does not protect the rights of persons to give and receive information only to allow the wholesale prohibition of its use by government fiat. While various uses of transferred information can be barred or restricted for independent reasons (licensing agreements are a prime example), they cannot be prohibited merely because they are “uses.”
Rejecting the state’s mechanistic reliance on Bartnicki is only the beginning, not the end. Although Bartnicki does not control, we nonetheless believe that what the state seeks to regulate here is conduct, not expression. This case poses the relatively narrow question of whether the Prescription Information Law constitutionally may bar these plaintiffs (data miners) from aggregating, manipulating, and transferring data for one particular purpose only. This brings vividly to mind Chief Justice Roberts’s admonition that “it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.” Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. (FAIR), 547 U.S. 47, 62, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949)).
We recognize, of course, that pure informational data can qualify for First Amendment protection. See Univ’l City Studios, Inc. v. Corley, 273 F.3d 429, 446-47 (2d Cir.2001) (“Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection.”); see also Va. Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (deeming ordered pairs of drug prices and products commercial speech). But that coin has a flip side. As Justice Holmes famously observed, “the First Amendment while prohibiting legislation against free speech as such cannot have been, and obviously was not, intended to give immunity for every possible use of language.” Frohwerk v. United States, 249 U.S. 204, 206, 39 S.Ct. 249, 63 L.Ed. 561 (1919).
The proof of this pudding is that entire categories of speech receive no protection at all from the First Amendment. Some have been explicitly recognized as lying outside the compass of the Free Speech Clause by virtue of longstanding tradition. See, e.g., Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (listing as examples “the lewd and obscene, the profane, the libelous, and the insulting or ‘fighting’ words”); see also Thompson v. W. States Med. Ctr., 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (explaining that false or misleading commercial speech may be *52 barred completely without constitutional concern).
There are other species of speech-related regulations that effectively lie beyond the reach of the First Amendment. These include agreements in restraint of trade, see, e.g., Nat’l Soc’y of Prof. Eng’rs v. United States, 435 U.S. 679, 697-98, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); communications in furtherance of crimes, see, e.g., Giboney, 336 U.S. at 498, 69 S.Ct. 684; statements or actions creating hostile work environments, see, e.g., O’Rourke v. City of Prov., 235 F.3d 713, 735 (1st Cir.2001); and promises of benefits made by an employer during a union election, see, e.g., NLRB v. Gissel Packing Co., 395 U.S. 575, 618-20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Supreme Court has recognized that these exceptions exist, see, e.g., Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); see also Richard H. Fallon, Jr., Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn’t Bark, 1994 Sup.Ct. Rev. 1, 8, but for whatever reason, the Justices have never deemed it necessary to address why or how these content-based prohibitions manage to escape First Amendment scrutiny. Thus, these laws loom as tacit but unexplained exceptions to the suzerainty of the First Amendment. See Wine & Spirits I, 418 F.3d at 53.
Scholars have labored to formulate theories about why First Amendment immunity exists in such cases. See, e.g., Neil M. Richards, Reconciling Data Privacy and the First Amendment, 52 U.C.L.A. L.Rev. 1149, 1165-74 (2005); Frederick Sehauer, The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience, 117 Harv. L.Rev. 1765, 1777-84 (2004). Despite these efforts, the matter remains a doctrinal mystery.
In our view, the most natural explanation for this phenomenon is that this complex of de facto exceptions derives from a felt sense that the underlying laws are inoffensive to the core values of the First Amendment — inoffensive because they principally regulate conduct and, to the extent that they regulate speech at all, that putative speech comprises items of nugatory informational value. It is this unusual combination of features that distinguishes these laws and places them outside the ambit of the First Amendment. Cf. Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766 (explaining inapplicability of First Amendment to fighting words because these words are “of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality”).
We believe that the transfers of prescriber-identifiable information regulated by the Prescription Information Law (transfers that otherwise would flow from pharmacies to data miners to detailers for the purpose of promoting the dispensation of expensive brand-name drugs) fit within this integument. The challenged portions of the statute principally regulate conduct, and to the extent that the challenged portions impinge at all upon speech, that speech is of scant societal value.
We say that the challenged elements of the Prescription Information Law principally regulate conduct because those provisions serve only to restrict the ability of data miners to aggregate, compile, and transfer information destined for narrowly defined commercial ends. In our view, this is a restriction on the conduct, not the speech, of the data miners. Cf. Wine & Spirts I, 418 F.3d at 49 (viewing “provision of advertising services, including designing advertisements, arranging for their placement in various media, and licensing the *53 common use of trade names” as conduct rather than speech). In other words, this is a situation in which information itself has become a commodity. The plaintiffs, who are in the business of harvesting, refining, and selling this commodity, ask us in essence to rule that because their product is information instead of, say, beef jerky, any regulation constitutes a restriction of speech. We think that such an interpretation stretches the fabric of the First Amendment beyond any rational measure.
The plaintiffs advance two related theories as to why their information processing constitutes speech. First, they analogize their situation to that of a newspaper, noting that they, like a newspaper, collect information of public concern, analyze it, and distribute it for a fee. Second, they liken this case to those in which the Supreme Court has struck down commercial speech restrictions on the ground that the speech contributes to the efficiency of the marketplace. The response to both of these arguments is rooted in the conduct/speech distinction: While the plaintiffs lip-synch the mantra of promoting the free flow of information, the lyrics do not fit the tune.[6] The Prescription Information Law simply does not prevent any information-generating activities. The plaintiffs may still gather and analyze this information; and may publish, transfer, and sell this information to whomever they choose so long as that person does not use the information for detailing. Like in FAIR, 547 U.S. at 62, 126 S.Ct. 1297, the restriction here is on the conduct (detailing) not on the information with which the conduct is carried out.
The plaintiffs’ true complaint, of course, is that in banning this use of their data, we risk drying up the market for their services. To that concern we repeat: “the First amendment does not safeguard against changes in commercial regulation that render previously profitable information valueless.” Wine & Spirits I, 418 F.3d at 48. In that case, we offered an example of the closure of a tax loophole rendering tax-shelter information worthless. See id. It is the same here: the seller of information can not be heard to complain that its speech is infringed by a law making the most profitable use of that information illegal. See id. (“The First Amendment’s core concern is with the free transmission of a message or idea from speaker to listener, not with the speaker’s ability to turn a profit.”).
Although speech, protected or not, is implicated by the Prescription Information Law, it consists primarily of communications between detailers and doctors — but no detailer or doctor is a plaintiff here. Therefore, an adjudication of that aspect of the law must await a proper plaintiff.
We add, moreover, that the fact that this information can be freely transferred to anyone for non-detailing purposes renders this case a world apart from statutes that have been struck down in the interest of “providing] a forum where ideas and information flourish.” Thompson, 535 U.S. at 367, 122 S.Ct. 1497 (quoting Edenfield v. Fane, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)); see also 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (striking down statute prohibiting advertisement of liquor prices); Edenfield, 507 U.S. at 777, 113 S.Ct. 1792 (striking *54 down statute prohibiting in-person solicitation by accountants); Va. Bd. of Pharm., 425 U.S. at 771-73, 96 S.Ct. 1817 (striking down statute prohibiting advertisement of price information for drugs).
Pharmaceutical detailing has pushed the art of marketing into uncharted waters. In the service of maximizing drug sales, detailers use prescribing histories as a means of targeting potential customers more precisely and as a tool for tipping the balance of bargaining power in their favor. As such, detailing affects physician behavior and increases the likelihood that physicians will prescribe the detailers’ (more expensive) drugs. The New Hampshire legislature found this advantage in bargaining power invidious (chiefly because of its inflationary impact on drug prices) and determined that it compromised the integrity of physician decisionmaking. Consequently, the legislature sought to level the playing field not by eliminating speech but, rather, by eliminating the detailers’ ability to use a particular informational asset— prescribing histories — in a particular way.
To be sure, certain information exchanges are foreclosed by the Prescription Information Law. They are not, however, the sorts of exchanges valued by the Supreme Court’s First Amendment jurisprudence but, rather, are exchanges undertaken to increase one party’s bargaining power in negotiations. We believe that in moving to combat the novel problems presented by detailing in the information age, New Hampshire has adopted a form of conduct-focused economic regulation that does not come within the First Amendment’s scope.
Accordingly, we hold that the challenged portions of the Prescription Information Law fall outside the compass of the First Amendment. They thus engender rational basis review as a species of economic regulation. See, e.g., Nat’l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir.1995). The plaintiffs concede that the challenged portions of the law survive that modest level of scrutiny. The challenge under the Free Speech Clause must, therefore, fail.
VI. FIRST AMENDMENT SCRUTINY
Although we could end our odyssey here, there is another path open to us that leads to the same distinction. Even if the Prescription Information Law is treated as a restriction on protected speech, it is nonetheless constitutional. This, then, constitutes an alternative ground for our decision.
Assuming, arguendo, that the acquisition, manipulation, and sale of prescriber-identifiable data comes within the compass of the First Amendment, the Prescription Information Law would have to survive intermediate scrutiny as a regulation of commercial speech. See Florida Bar v. Went For It, Inc., 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). As we explained above, see supra Part IV, the plaintiffs lack standing to assert the rights of the pharmaceutical companies, the de-tailers, or the physicians. Their challenge must therefore rise or fall based on the curtailment of their own rights (rights emanating from the upstream transactions to which they are privy).
If speech at all, these transactions are commercial speech; that is, they at most embody “expression related solely to the economic interest of the speaker and its audience.” Cent. Hudson, 447 U.S. at 561, 100 S.Ct. 2343. While the plaintiffs argue for a narrower definition of commercial speech limited to activities “proposing] a commercial transaction,” Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 473-74, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the case law is inhospitable to this argument. See, e.g., Pharm. Care Mgmt. *55 Ass’n v. Rowe, 429 F.3d 294, 309 (1st Cir.2005); El Dia, Inc. v. P.R. Dep’t of Consumer Affairs, 413 F.3d 110, 115 (1st Cir.2005). We therefore reject it and conclude instead that the Prescription Information Law, if regarded as a restriction on protected speech, must be analyzed under the rubric of commercial speech.
That conclusion brings front and center the familiar Central Hudson test. Under Central Hudson — so long as the speech in question concerns an otherwise lawful activity and is not misleading — statutory regulation of that speech is constitutionally permissible only if the statute is enacted in the service of a substantial governmental interest, directly advances that interest, and restricts speech no more than is necessary to further that interest. See Cent. Hudson, 447 U.S. at 556, 100 S.Ct. 2343; Wine & Spirits Retailers, Inc. v. Rhode Island (Wine & Spirits II), 481 F.3d 1, 8 (1st Cir.2007). In administering this test, we must remain mindful that the party seeking to sustain a restriction on commercial speech bears the burden of justifying that restriction. Thompson, 535 U.S. at 373, 122 S.Ct. 1497; Edenfield, 507 U.S. at 770, 113 S.Ct. 1792.
On behalf of the Prescription Information Law, New Hampshire cites three governmental interests: maintaining patient and prescriber privacy, protecting citizens’ health from the adverse effects of skewed prescribing practices, and cost containment. For simplicity’s sake, we restrict our analysis to the third of these interests.
Fiscal problems have caused entire civilizations to crumble, so cost containment is most assuredly a substantial governmental interest. As such, cost containment suffices to satisfy the first prong of the Central Hudson test.
The next question — whether the law directly advances that interest — is not so cut and dried. To succeed on this prong of the test, the state “must demonstrate that the harms it recites are real and that [the] restriction will in fact alleviate them to a material degree.” Edenfield, 507 U.S. at 770-71, 113 S.Ct. 1792. Speculation, surmise, or fevered imaginings will not carry the day. Id. at 770, 113 S.Ct. 1792.
This does not mean, however, that certitude is required. A state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest. See, e.g., Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). While empirical data must plausibly point to a conclusion, that data need not be “accompanied by a surfeit of background information.” Florida Bar, 515 U.S. at 628, 115 S.Ct. 2371. States are allowed “to justify speech restrictions by reference to studies and anecdotes” or even to justify them “based solely on history, consensus, and simple common sense.” Id. (internal quotation marks omitted).
Here, the state’s evidence falls into three evidentiary subsets, each of which forges some part of the causal chain leading from transfers of prescribes’ histories for use in detailing to higher drug prices.
The first category embodies evidence showing that detailing increases the cost of prescription drugs. The second involves a showing that prescribes’ histories enhance the success of detailing. The final category encompasses evidence indicating that, notwithstanding these escalating costs, detailing does not contribute to improved patients’ health. Drawing these inferences, the state reasons that stripping detailers of the ability to use prescribes’ histories as a marketing tool will decrease the quantities of (relatively expensive) brand-name drugs dispensed, increase the quantities of (relatively inexpensive) generic drugs dispensed, and thus reduce or *56 contain overall costs. The plaintiffs respond with evidence of the positive effects of detailing enhanced by prescribers’ histories and by noting that the state has not proven that health care costs will ebb following increased substitution of generic drugs for brand-name drugs.
The state’s initial point is unarguable: pharmaceutical companies use detailing to promote the sale of brand-name drugs, and those drugs cost significantly more than their generic counterparts.[7] Detailing works: that it succeeds in inducing physicians to prescribe larger quantities of brand-name drugs seems clear (even if the exact magnitude of that effect is not). See, e.g., Puneet Manchanda & Elisabeth Honka, The Effects and Role of Direct-to-Physician Marketing in the Pharmaceutical Industry: An integrative Review, 5 Yale J. Health Pol’y L. & Ethics 785, 809 (2005); Ashley Wazana, Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift?, 283 J. Am. Med. Ass’n 373, 378 (2000). The fact that the pharmaceutical industry spends over $4,000,000,000 annually on detailing bears loud witness to its efficacy.
The testimony adduced at trial reinforced these common-sense conclusions. Dr. Jerome Avorn, a professor at Harvard Medical School specializing in pharmacoe-pidemiology and pharmacoeconomics, described studies showing that detailing substantially increases physicians’ rates of prescribing brand-name drugs. This account echoed testimony of the president and president-elect of the New Hampshire Medical Society.
The evidence in support of the second step in the progression — that detailing becomes incrementally more successful when pursued with the aid of physician-specific prescribing histories — is less formidable. Still, Dr. Avorn drew analogies to opine that detailers armed with prescribing histories enjoyed a significant marketing advantage, resulting in greater leverage, increased sales of brand-name drugs, and higher drug costs — all with no corresponding benefit to patients. In addition, a former detailer, relying on personal experience, testified about various kinds of leverage that prescribing histories afforded detailers (e.g., the ability to target physicians prescribing large quantities of generic drugs, the ability to zero in on a physician’s customary prescribing choices, and the ability to punish physicians who fail to display allegiance to particular brand-name drugs). Each of these witnesses emphasized that prescribing histories helped the detailer to become more adversarial in her presentation and to focus on the weakness of the physician’s erstwhile drug of choice as opposed to the clinical virtues of the detailed drug. A promotional brochure published by IMS for detailers’ use corroborated many of these claims, as did a submitted newspaper article that formed part of the legislative history underlying the Prescription Information Law. See Liz Kowalczyk, Drug Companies’ Secret Reports Outrage Doctors, Boston Globe, May 25, 2003, at Al.
The plaintiffs did not deny that prescribing histories made detailing more efficacious. They did, however, try to cast detailing as a helpful and informative activity. In their view, prescribing histories enable detailers both to target the physi- *57 dans most likely to benefit from an educational interaction and to craft a marketing message tailored to the physician’s practice. The plaintiffs offered the testimony of Dr. Thomas Wharton, a distinguished cardiologist, to support this characterization. Dr. Wharton found detailing to produce highly informative interactions in which “the level of discourse is elevated.” Other testimony indicated that the availability of prescribing histories permitted detailers to inform physicians more quickly of negative information. Finally, the plaintiffs adduced evidence anent the purported value of identifying and targeting “early adopters.”
The district court determined that the state’s asserted cost containment interest failed to satisfy the second prong of the Central Hudson test. The court based this determination on its conclusion that the final link in the chain of reasoning was missing: “[t]he Attorney General appears to assume that any health care cost savings that will result from a ban on the use of prescriber-identifiable data can be achieved without compromising patient care.” D. Ct. Op., 490 F.Supp.2d at 180. This assumption was flawed, the court wrote, because brand-name drugs sometimes served patients better than their generic counterparts; thus, it was possible that an increase in generic drug prescriptions might compromise patient care, engender new medical costs, and overwhelm any savings. Id. at 180-81.
Admittedly, the state’s showing that health care costs would lessen should pres-criber histories be denied to detailers was not overwhelming. But even though there was no direct evidence on that point, the state did present unrebutted testimony to the effect that detailing tended dramatically to increase the prescription of brand-name drugs (and, thus, the cost of prescription drugs) without conferring any corresponding public health benefit. This was the opinion of Dr. Avorn, and Dr. Wazana’s article reached the same conclusion. See Wazana, supra, at 375. The record also contains evidence of widespread incidents' — Vioxx and calcium channel blockers are two prominent examples — that pointed in the same direction. Finally, the record contains a study that found that 11% of detailers’ statements to physicians were demonstrably inaccurate.[8] See M.G. Ziegler, P. Lew & B.C. Singer, The Accuracy of Drug Information from Pharmaceutical Sales Representatives, 273 J. Am. Med. Ass’n 1296 (1995).
In the face of this highly suggestive evidentiary predicate, the district court’s demand that the state prove that the substitution of generic drugs for brand-name drugs would not lead to higher net health care costs subjected the state to a level of scrutiny far more exacting than is required for commercial speech. See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (permitting city to rely on experiences of different localities); Nat’l Amusements, 43 F.3d at 742 (permitting town to rely on residents’ complaints, “constabulatory concern with a pattern of incidents,” and common sense). The state provided competent evidence that detailing increases the prescription of brand-name drugs, that brand-name drugs tend to be more expensive, that detailers’ possession of prescribing histories heightens this exorbitant effect, that many aggressively detailed drugs provide no benefit vis-a-vis their far cheap *58 er generic counterparts, and that detailing had contributed to pharmaceutical scandals endangering both the public health and the public coffers. Viewed against that background, the fact that some detailed brand-name drugs may produce superior results in some cases is too flimsy a hook on which to hang a conclusion that a decrease in the prescription of brand-name drugs would be unlikely to yield a net diminution in health care costs. While the state’s position is not ironclad, the district court’s objection to it partakes of a far greater degree of conjecture.
In the last analysis, this is more a matter of policy than of prediction. Just as some brand-name drugs produce superior results when compared to generic drugs, some generic drugs produce superior (or, at least, equal) results when compared to brand-name drugs. The record contains substantial evidence that, in several instances, detailers armed with prescribing histories encouraged the overzealous prescription of more costly brand-name drugs regardless of both the public health consequences and the probable outcome of a sensible cost/benefit analysis. By way of contrast, the record contains no evidence that in the absence of detailing, physicians have tended to prescribe generic drugs more often than either their patients’ health or their patients’ pocketbooks warranted. The district court seems to have overlooked this dichotomy.
Perhaps more important, the court appears to have disregarded the constraints under which states operate in formulating public policy on cutting-edge issues. New Hampshire was the first state to deny detailers access to prescribing histories. Had other states been in the vanguard, it might be permissible to take New Hampshire to task for not presenting studies relative to the law’s effect on net health care costs. But to demand such evidence from the first state to refuse detailers access to prescribing histories is to demand too much: that evidence simply does not exist. The First Amendment requires states to assess their own interests realistically and to take only reasonable steps in furtherance of these discerned interests; it does not require Augean feats in order to sustain regulations restricting commercial speech.
The short of the matter is that while a state legislature does not have unfettered discretion “to suppress truthful, nonmis-leading information for paternalistic purposes,” 44 Liquormart, 517 U.S. at 510, 116 S.Ct. 1495, there is in this area “some room for the exercise of legislative judgment,” id. at 508, 116 S.Ct. 1495. We are duty bound to grant the New Hampshire legislature such elbow room here.
To this we add that, as Justice Brandéis famously observed, “[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments.” New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandéis, J., dissenting). That is the case here — and we must allow the state legislature some leeway to experiment with different methods of combating a social and economic problem of growing magnitude.
At this point, the plaintiffs interpose yet another potential roadblock: they urge us to withhold deference to the legislature’s choice of goals and measures in light of the thinness of the legislative record and the relative celerity (four months) with which the legislature acted. They compare New Hampshire’s legislative record to the legislative record granted deference by the Supreme Court in Turner Broadcast System v. FCC, 520 U.S. 180, 199, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (noting that the congressional record included “years of *59 testimony and reviewing volumes of documentary evidence and studies offered by both sides” compiled three years of hearings).
This is a red herring. It is fanciful to suggest that the congressional record in Turner represents the threshold for deference. Furthermore, the plaintiffs’ argument converts the issue of deference into a mechanical counting of days and pages. We flatly reject this myopic approach. After all, deference is a matter of degree. Here, we defer to the New Hampshire legislature only on the narrow question of whether it is sensible to conclude (hypothetically) that net medical outlays will decrease as a result of the withdrawal of prescribing histories from detailers. Given the contents of the legislative record, we believe that deference is in order.
We need not probe this point more deeply. In the end, we conclude that the state adequately demonstrated that the Prescription Information Law is reasonably calculated to advance its substantial interest in reducing overall health care costs within New Hampshire.
This leaves the third Central Hudson question: whether the regulation is no more extensive than necessary to serve the state’s interest in cost containment. The Supreme Court has explained that this standard requires the restriction to be “in reasonable proportion to the interest served.” Edenfield, 507 U.S. at 767, 113 S.Ct. 1792. More recently, the Court applied a gloss, stating that “if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so.” Thompson, 535 U.S. at 371, 122 S.Ct. 1497.
Invoking Thompson, the district court concluded that New Hampshire’s goal of cost containment could have been achieved by three alternative measures, none of which would have restricted speech. D. Ct. Op., 490 F.Supp.2d at 181-83. On that basis, the court found that the third prong had not been met.
Our starting point is well-marked: “If the First Amendment means anything, it means that regulating speech must be a last — not first — resort.” Thompson, 535 U.S. at 373, 122 S.Ct. 1497. This does not mean, however, that a state must forgo legitimate regulatory goals merely because an objector can hypothesize alternative measures of doubtful efficacy that would leave speech unencumbered.
In this instance, the district court seems to have overestimated the extent to which the alternatives it described were geared to accomplish the state’s objective. The Prescription Information Law was a targeted legislative response to a particular problem that had proven resistant to a number of different regulatory approaches. The three measures embraced by the district court were no improvement on those ineffectual approaches.
The first of the measures comprises a ban on gifts between detailers and physicians. Such a measure would target a harm that the legislature never deemed central to its aims. Some studies do indicate that detailers’ gifts influence prescribing behavior, but the New Hampshire legislature only saw such gift-giving as pernicious when it occurred within the context of a high-intensity sales pitch made possible by a detailer’s possession of a physician’s prescribing history. Moreover, such a ban would have unintended consequences; it would necessarily cut off the flow of free samples that physicians receive from detailers and often dispense to indigent patients. New Hampshire was constitutionally entitled to attempt to regulate detailing without killing this golden goose.
*60 The second measure comprises an envisioned campaign to educate physicians to prescribe generic drugs whenever possible. This suggested measure fails as a matter of simple economics. Pharmaceutical companies spend over $4,000,000,000 per year on detailing. Against that marketing juggernaut, the state would need to commit enormous resources to put across a contrary message. It is not a ground for striking down a commercial speech regulation that some counter-informational campaign, regardless of the cost, might restore equilibrium to the marketplace of ideas. See Posadas de P.R. Assocs. v. Tourism Co, 478 U.S. 328, 344, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).
The third measure hinges on the thought that it would be workable for New Hampshire to retool its Medicaid program so that non-preferred drugs — such as expensive brand-name drugs for which non-bioequivalent generic substitutes exist— would only be dispensed upon a physician’s consultation with a pharmacist. See D. Ct. Op., 490 F.Supp.2d at 182. This suggested measure fails for impracticability, for incompleteness, and for coming too late in the prescription process. Implementing it would take extra time out of a doctor’s day and, in all events, would make no inroads with respect to privately insured patients. And finally, this third measure represents a crude attempt to remedy the compromised prescribing habits of physicians after the fact. We explain briefly.
Physicians prescribe medications for individuals on the basis of a multitude of factors. A generic drug' — -whether or not bioequivalent — will rarely be capable of being recommended across the board as a substitute for a brand-name drug because each drug offers subtly different situation-specific advantages. The physician must attend to the patient’s individual symptoms, make a diagnosis, and prescribe accordingly. Detailing provably skews physicians toward prescribing more brand-name drugs by highlighting strengths of brand-name drugs unrelated to the patient’s individual condition. Inserting one more laborious step into the decisionmak-ing process may incline physicians to prescribe fewer brand-name drugs and more generic drugs; but it will do nothing to correct for or efface the distorting factors previously introduced into the physician’s prescribing habits. The New Hampshire legislature enacted the Prescription Information Law not only to lower costs but also to prevent detailers from exerting so much influence over physicians’ prescribing habits.
In sum, we find that neither the plaintiffs nor the district court has identified an alternative to the Prescription Information Law that promises to achieve the goals of the law without restricting speech. Consequently, we hold that the Prescription Information Law is no more restrictive than necessary to accomplish those goals.
That ends our First Amendment inquiry. For the reasons elucidated above, we hold that the challenged portions of the Prescription Information Law survive the rigors of intermediate scrutiny. Thus, even if one assumes that those provisions to some extent implicate commercial speech, they do not violate the First Amendment.
VII. VOID FOR VAGUENESS
Terming numerous undefined words and phrases in the Prescription Information Law amorphous or ambiguous, the plaintiffs contend that' the statute is unconstitutionally vague.[9] This contention need not detain us.
*61 The pertinent statutory text is set out earlier in this opinion, see supra Part II, and it would serve no useful purpose to repastinate that ground. It suffices to say that the plaintiffs question virtually everything from soup to nuts-from the meaning of the adjective “identifiable” to the scope of the phrase “commercial purpose.” They allege that this pervasive imprecision chills protected speech (especially since violations of the statute may trigger both criminal and civil penalties). See Reno v. ACLU, 521 U.S. 844, 872, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).
We readily acknowledge that the Prescription Information Law is not a model of legislative craftsmanship. But statutes do not need to be precise to the point of pedantry, and the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague. See Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 93 (1st Cir.2004). That is the case here.
A federal court may interpret state law by using the same method and approach that the state’s highest court would use. See Nat’l Pharms., Inc. v. Feliciano-de-Melecio, 221 F.3d 235, 241-42 (1st Cir. 2000); see also Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 930 (9th Cir.2004) (“Ordinarily, in construing a state statute, we follow the state’s rules of statutory interpretation.”).
Under New Hampshire law, an inquiring court may consider legislative history to aid in clarifying an ambiguous statute. Hughes v. N.H. Div. of Aero., 152 N.H. 30, 871 A.2d 18, 26 (N.H.2005). The objective is to construe a statute “in light of the legislature’s intent in enacting [it], and in light of the policy sought to be advanced by the entire statutory scheme.” Carlisle v. Frisbie Mem. Hosp., 152 N.H. 762, 888 A.2d 405, 417 (N.H.2005). Consistent with that approach, an inquiring court should not hesitate to “presume any narrowing construction or practice to which the law is fairly susceptible.” City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (internal quotation marks omitted); see Stenberg v. Carhart, 530 U.S. 914, 944-45, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); R.I. Ass’n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 36 (1st Cir.1999).
Read in light of the legislature’s manifest intent, the Prescription Information Law is sufficiently clear to withstand the plaintiffs’ vagueness challenge. The legislature’s avowed intent was to curtail in New Hampshire what it viewed as the pernicious practice of targeted detailing by pharmaceutical companies. It sought to do so by prohibiting “for any commercial purpose” the dissemination and use of the data on which targeting had come to depend: prescriber histories. In keeping with this narrow purpose, the statute excludes from its coverage almost every commercial use other than detailing; the listed exemptions include “pharmacy reimbursement; formulary compliance; care management; utilization review by a health care provider, the patient’s insurance provider or the agent of either; health care research or as otherwise provided by law.” N.H.Rev.Stat. Ann. § 318:47-f.
As we understand the state’s position, these categories of exceptions are to be construed broadly to avoid impinging upon uses of prescriber-identifiable data that do not implicate the state’s core concern. For example, the Attorney General explicitly acknowledged in the court below that *62 the Prescription Information Law does not bar the plaintiffs from selling prescriber-identifiable data to pharmaceutical companies for research or for recruiting physicians to participate in clinical trials of newly developed drugs. Given that understanding, the fact that data derived from such research or trials later may be used in the companies’ general marketing cannot transform the permitted uses into ones that have an impermissible purpose. After all, marketing and sales are the ultimate purposes for virtually all research done by pharmaceutical companies. As long as the companies do not undertake targeted detailing of New Hampshire-based clinical trial participants — whose prescribing data was obtained for research purposes — there is no violation of the Prescription Information Law.
We recognize that this construction of the Prescription Information Law is not inevitable. But this is a facial challenge, and the state’s articulated purpose narrows the interpretive lens through which we must view the problem. See Davis v. FEC, -U.S.-, 128 S.Ct. 2759, 2770-71, 171 L.Ed.2d 737 (2008) (noting that in facial challenges courts should “extend[ ] a measure of deference to the judgment of the legislative body that enacted the law”); Wash. State Grange v. Wash. State Repub. Party, — U.S.-, 128 S.Ct. 1184, 1194, 170 L.Ed.2d 151 (2008) (explaining that deference requires an inquiring court to ask whether challenged law could possibly be implemented constitutionally). This perspective requires us to give the exceptions their full scope and eliminates any chilling effect. Health care professionals who use prescriber-identifiable data to influence physician prescribing decisions other than through direct marketing need not be concerned that their activity will offend the statute.
This narrow reading of the Prescription Information Law similarly serves to allay concerns that pharmacies and other sources of preseriber data will be subject to prosecution based on some improper downstream use of that data. As long as such entities impose conditions on the transfer of such data that require purchasers to comply with the terms of the law, they are safe. Thus, when data is requested for one of the myriad uses that are permissible under the Prescription Information Law, there should be no chilling effect.[10]
For these reasons, we reject the plaintiffs’ contention that the law is void for vagueness.
VIII. DORMANT COMMERCE CLAUSE
Finally, the plaintiffs mount a Commerce Clause challenge to the Prescription Information Law. They maintain that the statute violates the Constitution by regulating conduct wholly outside New Hampshire. This argument is unavailing.
The Commerce Clause, ostensibly an affirmative grant of power to Congress “[t]o regulate Commerce ... among the several states,” U.S. Const, art. I § 8 cl. 3, embodies a negative aspect that “prevents state and local governments from impeding the free flow of goods from one state to another.” Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir.2005) (quoting Houlton Citizens’ Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999)). The proper mode of analysis un *63 der this so-called “dormant Commerce Clause” depends upon the scope of the challenged statute. See id. A law that purports to regulate conduct occurring wholly outside the enacting state “outstrips the limits of the enacting state’s constitutional authority and, therefore, is per se invalid.” Id.; see Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 79 (1st Cir.2001), aff'd, 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003). This is the principle that the plaintiffs see as controlling here.
Their argument runs along the following lines. They point out that the New Hampshire law lacks any explicit mention of a geographic limitation. Building on this foundation, they invite us to hold that the N.H.Rev.Stat. Ann. § 318:47-f. prohibits the licensing, transfer, use, and sale of prescriber-identifiable data everywhere, (including transactions that take place wholly outside New Hampshire). So interpreted, the statute would, among other things, prohibit the transfer of data from a pharmacy benefits manager located in, say, New York to Verispan, a Delaware firm headquartered in Pennsylvania. Such a direct regulation of out-of-state transactions would, the plaintiffs assert, be per se invalid under the dormant Commerce Clause. See Alliance of Auto. Mfrs., 430 F.3d at 35.
For its part, the state urges us to interpret the law as governing only in-state transactions. As we already have explained, a federal court normally should interpret state law using the same method and approach that the highest court of the state would use. See Nat’l Pharms., 221 F.3d at 241-42.
An assertion that the Commerce Clause invalidates a particular statutory scheme presents a facial challenge to that statute. See generally United States v. Nascimento, 491 F.3d 25, 41 (1st Cir.2007) (distinguishing facial and as-applied Commerce Clause challenges to federal law), cert. denied, — U.S.-, 128 S.Ct. 1738, 170 L.Ed.2d 543 (2008). “[I]n evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered.” McGuire v. Reilly, 386 F.3d 45, 58 (1st Cir.2004) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 795-96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). This same deference obtains in the courts of New Hampshire. See In re Morgan, 144 N.H. 44, 742 A.2d 101, 109 (N.H.1999) (counseling deference to administrative interpretations of statutes unless such an interpretation is “plainly incorrect”).
Two additional principles of statutory interpretation figure into the equation. First, state statutes should be presumed to govern only conduct within the borders of the enacting state. See KS Pharms., Inc. v. Am. Home Prods. Corp., 962 F.2d 728, 730 (7th Cir.1992); State v. McGlone, 96 N.H. 448, 78 A.2d 528, 530 (N.H.1951). Second, statutes should be given a constitutional as opposed to an arguably unconstitutional interpretation whenever fairly possible. See Arizonans for Official English v. Arizona, 520 U.S. 43, 78, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); Nascimento, 491 F.3d at 38; see also Sibson v. State, 110 N.H. 8, 259 A.2d 397, 400 (N.H.1969) (explaining that “a statute will be construed to avoid a conflict with constitutional rights whenever that course is reasonably possible”).
Here, the New Hampshire Attorney General — the state official charged with enforcing its laws — has exhorted us to read the Prescription Information Law to “relate only to activity that takes place domestically.” Appellant’s Reply Br. at 13. This narrowing construction is reason *64 able and accords with the tenet that laws should not be presumed to have extraterritorial effect. It also avoids any doubt about the law’s constitutionality under the dormant Commerce Clause. As the Seventh Circuit wisely observed when confronted with a similar state statute lacking any built-in geographic restriction, it would make no sense to read the statute to regulate out-of-state transactions when the upshot of doing so would be to annul the statute. See K-S Pharms., 962 F.2d at 730.
There is no need to belabor the point. We are confident that the New Hampshire Supreme Court would interpret the Prescription Information Law to affect only domestic transactions. Seen in this light, the plaintiffs’ dormant Commerce Clause challenge necessarily fails. This law may result in a loss of profit to out-of-state data miners due to the closing of one aspect of the New Hampshire market for their wares, but that circumstance amounts neither to regulating conduct outside the state nor to “necessarily requiring] out-of-state commerce to be conducted according to in-state terms.” Wine & Spirits II, 481 F.3d at 15.
We add a coda. Our dissenting brother concedes that, on its face, the Attorney General’s interpretation of the Prescription Information Law obviates any Commerce Clause problem. He nevertheless suggests that that interpretation leaves the Act with “negligible impact” and is, therefore, unreasonable. We fail to see the logic in this suggestion.
To be sure, the Attorney General’s plausible interpretation of the Prescription Information Law, which permits the routine transfer of data to out-of-state facilities where it can then be aggregated and sold legally to others, may not accomplish very much.[11] But that does not make the Attorney General’s interpretation unreasonable. See McGuire, 386 F.3d at 58; In re Morgan, 742 A.2d at 109. There is no rule that forbids a legislature from enacting prophylactic legislation to prevent disfavored activity before individuals engage in that activity.
IX. CONCLUSION
We need go no further. For the reasons elucidated above, we reverse the decision of the district court and vacate the injunction against enforcement of the Prescription Information Law.

Reversed.

. Our description of detailing owes much to the precise accounts provided by two district courts, including the court below. See IMS Health Corp. v. Rowe, 532 F.Supp.2d 153, 157-65 (D.Me.2007); D. Ct. Op., 490 F.Supp.2d at 165-74.

. Because of the ready availability of reliable figures, the parties used the year 2000 as a benchmark year for illustrative purposes. It is dear from the anecdotal evidence that both the incidence of detailing and the gross amounts expended in its service have increased in the intervening years.

. Nevertheless, a significant number of physicians flatly refuse detailing visits, convinced that they are either unethical or a waste of time.

. To be sure, some of the amici profess to represent such interests. But, absent special circumstances (not present here), issues advanced exclusively by an amicus ought not to be considered on appeal. See, e.g., United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir.1997); United States v. Taylor, 54 F.3d 967, 972 (1st Cir.1995); Lane v. First Nat'l Bank, 871 F.2d 166, 175 (1st Cir.1989).

. The dissent seems to equate prudential standing rules with precatory guidelines. That is an incorrect assessment. Although the Court has said that prudential standing doctrine derives primarily from pragmatic concerns, that is a far cry from saying that standing rules can be ignored by a district court in the interests of expediency. See Valley Forge Christian Coll. v. Americans United for Sep’n of Church and State, Inc., ("Merely to articulate these principles is to demonstrate their close relationship to the policies reflected in the Art. Ill requirement of actual or threatened injury amenable to judicial remedy.”). For example, the prohibition against adjudicating generalized grievances is a prudential doctrine — but we can find no case in which that barrier has been lifted in the interest of pragmatism. Here, then, detouring around third-party standing rules requires a showing of hindrance. See Kowalski, 543 U.S. at 129-30, 125 S.Ct. 564.

. Characterizing the Prescription Information Law as a paternalistic ban on the influx of information into the marketplace misses the point. Detailers do not routinely disclose a physician’s prescribing history to that physician. Indeed, many physicians who interact with detailers never discover that the detailers possess such information.

. Of course, targeted detailing is employed not only to promote the sale of brand-name drugs in lieu of generic drugs, but also to encourage prescribers to choose one particular brand-name drug over another. The latter situation is not the state's primary concern because the cost differential between competing brand-name drugs is less likely to be significant.

. The plaintiffs responded to this study by citing the federal Food and Drug Administration regulations prohibiting false medical advertisements. See 21 C.F.R. § 202.1. That response is a non-sequitur. The fact that certain behavior is prohibited by law is not a guarantee that persons will not engage in it.

. The plaintiffs mention in passing that the Prescription Information Law is overbroad *61 but they do not develop an overbreadth argument. Any such argument is, therefore, waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990).

. Because no pharmaceutical company is a party to this litigation, we decline to address whether an action could be maintained under the Prescription Information Law against a pharmaceutical company that uses data properly acquired for one purpose to target physicians for detailing.

. The question remains, however, whether the purchasers could subsequently make use of the aggregated data in New Hampshire. That question is not before us.